RECORD NUMBER: 12-2396 (L), 12-2397

# United States Court of Appeals

*for the*

# Fourth Circuit

**T-MOBILE NORTHEAST LLC,**

*Appellee/Cross Appellant.*

– v. –

**LOUDOUN COUNTY BOARD OF SUPERVISORS,**

*Appellant/Cross-Appellee,*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA**

# APPELLEE/CROSS APPELLANT'S OPENING AND RESPONSE BRIEF

T. SCOTT THOMPSON
DANIEL P. REING
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
(202) 973-4200

*Counsel for Appellee/Cross Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

T-Mobile Northeast LLC is a Delaware limited liability company and wholly-owned subsidiary of T-Mobile USA, Inc., a Delaware corporation.  T-Mobile USA, Inc. is a wholly-owned subsidiary of T-Mobile Global Holding GmbH, a German entity which, in turn, is a wholly-owned subsidiary of T-Mobile Global Zwischenholding GmbH, a German entity.  T-Mobile Global Zwischenholding GmbH is a wholly-owned subsidiary of Deutsche Telekom AG, a German entity.  Deutsche Telekom AG is a publicly-traded company in that the American Depository Receipts of Deutsche Telekom AG are traded on the Over-the-Counter Market in the United States.  No other entity owns 10% or more of T-Mobile USA, Inc.

# Table of Contents

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................2

STATEMENT OF THE CASE ............................................................3

STATEMENT OF FACTS .................................................................7

I.      T-MOBILE HAS A SIGNIFICANT DEFICIENCY IN ITS WIRELESS
        SERVICE .......................................................................7

II.     THE STEPHENS' SILO SITE .................................................7

III.    THE BELL TOWER SITE ....................................................13

        A. Application .............................................................13

        B. Bell Tower Site Option Agreement ...................................17

SUMMARY OF THE ARGUMENT .....................................................18

ARGUMENT ...............................................................................23

I.      STANDARD OF REVIEW ....................................................23

II.     THE TELECOMMUNICATIONS ACT OF 1996................................23

III.    T-MOBILE HAS STANDING TO BRING THIS CASE ........................27

IV.     THE DISTRICT COURT WAS CORRECT IN FINDING THAT THE
        BOARD'S DENIAL OF THE STEPHENS SILO SITE VIOLATED 47
        U.S.C. § 332(c)(7)(B)(iv)...................................................32

        A. The Board Is Not Free To Violate Federal Law By Also Offering
           Potentially Lawful Reasons For Denial ...............................33

        B. The Stephens Silo Site Was *Explicitly* Denied Based On The Perceived
           Negative Environmental Impact of RF Emissions ....................37

        C. The Board Denied The Stephens Silo Site In A Single Action .........38

        D. An Injunction Is The Appropriate Remedy ...........................39

V.      THE DISTRICT COURT ERRED IN HOLDING THAT THE BOARD'S
        DENIAL OF THE BELL TOWER SITE DID NOT PROHIBIT, OR HAVE
        THE EFFECT OF PROHIBITING, T-MOBILE'S PROVISION OF
        PERSONAL WIRELESS SERVICES IN VIOLATION OF 47 U.S.C. §
        332(c)(7)(B)(i)(II) ..........................................................41

A. The Effective Prohibition Standard ...........................................................41

B. T-Mobile Has An Effective Absence of Coverage .....................................42

   1. If T-Mobile Is Not Able To Provide Reliable Service Inside Buildings, Consumers Will Not Consider It To Be Providing A Viable Service ...44

   2. Multiple Courts Have Recognized That The Inability To Provide Reliable In-Building Service Creates A Legally-Cognizable Prohibition Of Service .................................................................................................46

   3. Public Policy Supports The Need For Reliable In-Building Service Levels .................................................................................................48

   4. Federal Regulations Contemplate That Carriers, Such As T-Mobile, Will Establish The Relevant Signal Strength Standards ......................50

   5. In RF Network Design, If There Is Inadequate Signal Strength To Provide "Reliable" Service, Then There Is No Provision Of Service ...52

   6. The District Court Erroneously Concluded That T-Mobile Sought A "100% Reliability Standard" ............................................................55

C. There Are No Reasonable Alternatives Available to Remedy T-Mobile's Coverage Deficiency .................................................................................58

   1. T-Mobile Undertook A Diligent And Complete Search, Ruling Out All Reasonable Potential Alternatives ..................................................60

   2. The Theoretical Designs Proposed By The Board's Witness Are Not Available Or Will Not Remedy The Effective Absence Of Service .....61

   3. The District Court's Analysis Depended On The Erroneous Premise That A Lack Of In-Building Service Is Not A Cognizable Deficit .......64

   4. The District Court Erroneously Ignored Mr. Conroy's Testimony That Ms. Malone's Coverage Predictions Were Inaccurate And Unreliable ............................................................................................65

VI.  THE DISTRICT COURT ERRED IN HOLDING THAT THE BOARD'S DENIALS WERE SUPPORTED BY SUBSTANTIAL EVIDENCE AND DID NOT VIOLATE 47 U.S.C. § 332(c)(7)(B)(iii) .......................................66

A. Substantial Evidence Standard .................................................................66

B. Stephens Silo Site.....................................................................................68

C. Bell Tower Site .........................................................................................71

VII. CONCLUSION ............................................................................................73

# TABLE OF AUTHORITIES

Page(s)

## CASES

*360° Communications Co. v. Board of Supervisors of Albemarle County*,
  211 F.3d 79 (4th Cir. 2000) ................................................................57

*American Cellular Network Co. v. Upper Dublin Twp.*,
  203 F.Supp.2d 383 (E.D. Pa. 2002) ....................................................46

*American Textile Mfrs. Inst., Inc. v. Donovan*,
  452 U.S. 490 (1981)............................................................................67

*APT Pittsburgh, L.P. v. Penn Twp.*,
  196 F.3d 469 (3d Cir. 1999) ...............................................................27

*AT&T Wireless of Cal., LLC v. City of Carlsbad*,
  308 F.Supp.2d 1148 (S.D. Cal. 2003)............................................34, 35

*AT&T Wireless PCS, Inc. v. City Council of Virginia Beach*,
  155 F.3d 423 (4th Cir. 1998) .........................................................37, 66

*Board of Zoning Appeals v. CaseLin Sys.*,
  501 S.E.2d 97 (Va. 1998) ...................................................................38

*Brehmer v. Planning Bd. of Town of Wellfleet*,
  238 F.3d 117 (1st Cir. 2001)...............................................................41

*California RSA No. 4 v. Madera County*,
  332 F.Supp.2d 1291 (E.D. Cal. 2003) ...........................................34, 35

*Cellular Phone Taskforce v. FCC*,
  205 F.3d 82 (2d Cir. 2000) .................................................................35

*Cellular Tel. Co. v. Town of Oyster Bay*,
  166 F.3d 490 (2d Cir. 1999) .........................................................passim

*Cellular Tel. Co. v. Zoning Board of Adjustment of Borough of Ho-Ho-Kus*,
  197 F.3d 64 (3d Cir. 1999) .................................................................57

iv

*Cingular Wireless, LLC v. Thurston County*,
    425 F.Supp.2d 1193 (W.D. Wash. 2006) ...........................................47

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005)............................................................24, 25, 27

*Decision Insights, Inc. v. Sentia Group, Inc.*,
    416 Fed.Appx. 324 (4th Cir. 2011).....................................................66

*Firstenberg v. City of Santa Fe*,
    782 F.Supp.2d 1262 (D.N.M. 2011).....................................................37

*Green Mountain Realty Corp. v. Leonard*,
    2012 WL 3234407 (1st Cir. 2012).......................................................34

*Henry v. Purnell*,
    652 F.3d 524 (4th Cir. 2011)(en banc) .............................................23

*Hunt v. Cromartie*,
    526 U.S. 541 (1999).......................................................................66

*In re French*,
    499 F.3d 345 (4th Cir. 2007) ..........................................................66

*Iowa Wireless Servs. L.P. v. City of Moline*,
    29 F.Supp.2d 915 (C.D. Ill. 1998) ....................................................35

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
    981 F.2d 160 (4th Cir. 1992)(en banc) .............................................23

*Merrick Gables Ass'n v. Town of Hempstead*,
    691 F.Supp.2d 355 (E.D.N.Y. 2010) ..................................................35

*MetroPCS Inc. v. City & County of San Francisco*,
    2006 WL 1699580 (N.D. Cal.) ..........................................................46

*MetroPCS, Inc. v. City & County of San Francisco*,
    400 F.3d 715 (9th Cir. 2005) ..........................................................73

*MetroPCS N.Y., LLC v. Village of East Hills*,
    764 F.Supp.2d 441 (E.D.N.Y. 2011) ..................................................47

*Monumental Paving & Excavating, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.*,
   176 F.3d 794 (4th Cir. 1999) ............................................................23

*New York SMSA LP v. Village of Mineola*,
   2003 WL 25787525 (E.D.N.Y. Mar. 26, 2003)............................34, 35

*Nextel Partners, Inc. v. Town of Amherst*,
   251 F.Supp.2d 1187 (W.D.N.Y. 2003)..............................................47

*Oglesby v. General Motors Corp.*,
   190 F.3d 244 (4th Cir. 1999) ............................................................45

*Omnipoint Commc'ns MB Operations, LLC v. Town of Lincoln*,
   107 F.Supp.2d 108 (D. Mass. 2000).................................................58

*Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*,
   181 F.3d 403 (3d Cir. 1999) .......................................................41, 67

*Omnipoint Holdings, Inc. v. City of Cranston*,
   586 F.3d 38 (1st Cir. 2009)...............................................................54

*Petersburg Cellular P'ship v. Board of Supervisors of Nottoway County*,
   205 F.3d 688 (4th Cir. 2000) ............................................................66

*Preferred Sites, LLC v. Troup County*,
   296 F.3d 1210 (11th Cir. 2002) ........................................................41

*Second Generation Props. L.P. v. Town of Pelham*,
   313 F.3d 620 (1st Cir. 2002)..............................................................53

*Sprint Spectrum v. Willoth*,
   176 F.3d 630 (2d Cir. 1999) .....................................................passim

*T-Mobile Cent., LLC v. Charter Twp. of West Bloomfield*,
   691 F.3d 794 (6th Cir. 2012) ..............................................40, 67, 70

*T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County*,
   528 F.Supp.2d 1128 (D. Kan. 2007)................................................47

*T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County*,
   546 F.3d 1299 (10th Cir. 2008) ..................................................67, 73

*T-Mobile Northeast LLC v. City Council of Newport News*,
   674 F.3d 380 (4th Cir. 2012), *cert. denied*, 2012 U.S. LEXIS 6854 (Oct.
   1, 2012) .........................................................................................67

*T-Mobile Northeast LLC v. Fairfax County Bd. of Supervisors*,
   672 F.3d 259 (4th Cir. 2012) ....................................................passim

*T-Mobile Northeast, LLC v. Frederick County Bd. of Appeals*,
   761 F.Supp.2d 282 (D. Md. 2010).....................................................73

*T-Mobile Northeast LLC v. Town of Ramapo*,
   701 F.Supp.2d 446 (S.D.N.Y. 2009) ....................................36, 37, 55

*T-Mobile USA, Inc. v. City of Anacortes*,
   572 F.3d 987 (9th Cir. 2009) ............................................................34

*T-Mobile West Corp. v. City of Agoura Hills*,
   2010 WL 5313398 (C.D. Cal. Dec. 20, 2010)...................................47

*T-Mobile West Corp. v. City of Huntington Beach*,
   2012 WL 4867775 (C.D. Cal. Oct. 10, 2012) ............................47, 58

*Telespectrum, Inc. v. Public Serv. Comm'n of Ky.*,
   227 F.3d 414 (6th Cir. 2000) ............................................................70

*U.S.C.O.C. of N.H. RSA #2 v. Town of Dunbarton*,
   2005 WL 906354 (D.N.H. Apr. 20, 2005) ........................................46

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951)..........................................................................66

## STATUTES

28 U.S.C. §1291 ...................................................................................... 1

28 U.S.C. §1331 .......................................................................................1

47 U.S.C. §151 ................................................................................... 24-25

47 U.S.C. §332(c)(7)(A) ...........................................................................5

47 U.S.C. §332(c)(7)(B)(i)(II) .........................................................passim

47 U.S.C. §332(c)(7)(B)(iii) ............................................................passim

47 U.S.C. §332(c)(7)(B)(iv) ..............................................................passim

47 U.S.C. §332(c)(7)(B)(v) ...............................................28, 39, 40

47 U.S.C. §615 ...............................................................................48

Pub. L. No. 104-104, 110 Stat. 56 (1996).................................23, 24

Pub. L. No. 111-5, 123 Stat. 115 (2009)........................................25

## FCC DECISIONS

*Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Sixteenth Report, 2013 WL 1187836 (2013) ...............................................50, 52

*In the Matter of Amendment of the Commission's Rule To Establish New Personal Communications Services*, 8 F.C.C.R. 7700 (1993).............................................................50, 53

*Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance*, 24 F.C.C.R. 13994 (2009)........................................24, 49

## OTHER AUTHORITIES

47 C.F.R. §22.99 .....................................................................54, 57

H.R. Conf. Rep. No. 104-458 (1996)..........................................24, 34

H.R. Rep. No. 104-204, pt. 1 (1995) ..........................................25, 27

Loudoun County Zoning Ord. § 1-103 ..........................................8, 68

Loudoun County Zoning Ord. § 5-618 ...........................7, 13, 59, 60

Loudoun County Zoning Ord. § 6-1316 ............................................71

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over Appellee/Cross-Appellant T-Mobile Northeast LLC's ("T-Mobile") claims pursuant to 28 U.S.C. §1331 and 47 U.S.C. §332(c)(7)(B)(v). The District Court's October 12, 2012 decision, granting in part and denying in part T-Mobile's motion for summary judgment and granting in part and deny in part the Loudoun County Board of Supervisors' ("Board") cross-motion for summary judgment, is a final judgment disposing of all parties' claims. JA113-58. T-Mobile timely filed its notice of cross-appeal on November 12, 2012. JA160.

This Court has jurisdiction under 28 U.S.C. §1291.

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

(1) Whether the District Court correctly held that the Board's denial of T-Mobile's application to construct a personal wireless services facility at the Stephens' Farm violated 47 U.S.C. §332(c)(7)(B)(iv), where the denial was explicitly based on the perceived negative environmental impact of radio frequency emissions?

(2) Whether the District Court erred in holding that the Board's denial of T-Mobile's application to construct a personal wireless services facility at the Stephens' Farm was supported by substantial evidence pursuant to 47 U.S.C. §332(c)(7)(B)(iii), where the proposed facility would have the outward appearance of a silo on a farm and silos are permitted by right on agricultural properties, with no limitation on height.

(3) Whether the District Court erred in holding that the Board's denial of T-Mobile's application to install a personal wireless services facility at the Christ Our Savior Lutheran Church ("Church") was supported by substantial evidence in the written record pursuant to 47 U.S.C. §332(c)(7)(B)(iii), where the proposed facility would have the outward appearance of a bell tower in a church parking lot.

(4) Whether the District Court erroneously held that the Board's denial of T-Mobile's application to install a personal wireless services facility at the

Church did not have the effect of prohibiting T-Mobile from providing personal

wireless services, in violation of 47 U.S.C. §332(c)(7)(B)(i)(II), where T-

Mobile has an effective absence of coverage in its wireless service and there is

no reasonable alternative site to provide such coverage.

(5) Whether the District Court erroneously held that the Board's denial of T-

Mobile's application to install a personal wireless services facility at the

Church was not based on concerns related to radio frequency emissions, in

violation of 47 U.S.C. §332(c)(7)(B)(iv).

## STATEMENT OF THE CASE

This case concerns the Board's unlawful denial of T-Mobile's separate

applications to install personal wireless services facilities on private property at

two locations in Loudoun County, Virginia.

In the Telecommunications Act of 1996, Congress sought to promote the

deployment of advanced, competitive telecommunications networks and services.

In Section 332(c)(7)(B), Congress adopted specific procedural and substantive

limitations on the authority of local governments.  In particular,  the Board's denial

of a wireless facility application cannot have the effect of prohibiting the provision

of wireless services, the Board's denial must be supported by substantial evidence

contained in the written record, and the Board cannot regulate the placement of

wireless facilities on the basis of environmental and health effects of radio frequency ("RF") emissions.  47 U.S.C. §§332(c)(7)(B)(i)(II), (B)(iii), (B)(iv).

T-Mobile applied for the permits necessary to construct (1) a personal wireless services facility disguised as a bell tower at the Christ Our Savior Lutheran Church ("Church") in Sterling, Virginia ("Bell Tower Site") and (2) a personal wireless services facility disguised as an agricultural silo at the Stephens' Farm in Lovettesville, Virginia ("Stephens Silo Site").  In both cases, all antennas would be completely hidden inside the structures.  After hearings on October 4, 2011 and October 17, 2011, the Board denied T-Mobile's applications for the Bell Tower Site and Stephens Silo Site, respectively.

The Board's denials of T-Mobile's applications for the Bell Tower Site and the Stephens Silo Site violate Sections 332(c)(7)(B)(iii) and (iv), and the Board's denial of the Bell Tower Site also violates Section 332(c)(7)(B)(i)(II). Accordingly, on November 3, 2011, T-Mobile timely filed suit in the United States District Court for the Eastern District of Virginia challenging the Board's denial of the Bell Tower Site.  On November 16, 2011, T-Mobile timely filed its First Amended Complaint adding a challenge to the Board's denial of the Stephens Silo Site.  On December 5, 2011, the Board filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, a Motion to Dismiss for Failure to State a Claim, a Motion to Join, or to Dismiss for Failure to Join, Necessary Parties, and its

Answer. JA14-18. In response, T-Mobile filed its Second Amended Complaint, and the Board agreed to and did withdraw its Motion to Dismiss for Lack of Subject Matter Jurisdiction. On February 17, 2012, the District Court heard argument on the Board's remaining motions seeking dismissal, denying both motions. JA36.

On April 20, 2012, T-Mobile filed its Third Amended Complaint – the operative complaint in this case – stating five claims against the denial of the Bell Tower Site and the Stephens Silo Site: (1) The denial of the Bell Tower Site was not supported by substantial evidence, in violation of 47 U.S.C. §332(c)(7)(B)(iii); (2) The denial of the Bell Tower Site effectively prohibits T-Mobile from providing personal wireless services, in violation of 47 U.S.C. §332(c)(7)(B)(i)(II); (3) The denial of the Bell Tower Site was based on the perceived environmental effects of RF emissions, in violation of 47 U.S.C. §332(c)(7)(B)(iv); (4) The denial of the Stephens Silo Site was not supported by substantial evidence, in violation of 47 U.S.C. §332(c)(7)(B)(iii); and (5) The denial of the Stephens Silo Site was based on the perceived environmental effects of RF emissions, in violation of 47 U.S.C. §332(c)(7)(B)(iv). JA39-94.

On July 20, 2012, the Parties filed cross-motions for summary judgment. JA95-100. On September 14, 2012, the District Court heard argument on the parties cross-motions for summary judgment. JA101-12. On October 12, 2012,

the District Court issued its written opinion, and entered final judgment, granting

the Board summary judgment on T-Mobile's Counts 1-4 and granting T-Mobile

summary judgment on Count 5.  JA113-58.  The Board filed its notice of appeal on

November 8, 2012.  JA159.  T-Mobile timely filed its notice of cross-appeal on

November 12, 2012.  JA160.

## STATEMENT OF FACTS

### I.    T-MOBILE HAS A SIGNIFICANT DEFICIENCY IN ITS WIRELESS SERVICE

T-Mobile provides personal wireless services pursuant to licenses issued by the FCC.  JA166.  To provide its service, T-Mobile must deploy a network of interrelated "cell sites," and within those cells there must be RF signal strength adequate to allow the user's mobile device to reliably complete and hold a call. JA336, 547-48.  If T-Mobile is unable to construct the cell sites necessary to provide sufficient RF signal strength and capacity within a specific geographic area, T-Mobile will not be able to provide service to consumers within that area. JA336.

T-Mobile's RF engineers use sophisticated computer programs and extensive field testing to determine where cell sites need to be located to provide signal strength and capacity sufficient to support service.  JA336.  Based on analysis by its RF engineers, T-Mobile determined that it has an effective absence of coverage affecting its ability to provide service in a significant area in the vicinity of the Church.

### II.    THE STEPHENS' SILO SITE

To improve its coverage in the area near Lovettsville, T-Mobile began a search for suitable sites for co-location on existing tall structures as required by the County's laws.  JA166-67.  The only existing structures within a two mile radius of

7

the Stephens farm were two silos on Simpson Farm Lane. JA166-67, 1480, 1510-11, 1516-18. However, the existing silos are not tall enough to remedy T-Mobile's coverage and service issues. JA166-67, 1480, 1510-11, 1516-18. To meet T-Mobile's service needs, the existing silos on the Simpson Farm would need to be significantly increased in size, which under the County's Code would mean that the installations would no longer be favored "co-locations." JA298-323, 344-46, 349-50, 1350-51, 1384.

Nonetheless, in 2009, T-Mobile investigated extending the height of the tallest silo on the Simpson Farm, but discovered that the property was going into foreclosure. (*Id.*) As of spring of 2011, T-Mobile's efforts to contact the property owner again were unsuccessful. (*Id.*) Accordingly, T-Mobile evaluated other alternatives and ultimately reached an agreement to construct the proposed silo on the Stephens' property. JA166-67.

The Stephens' farm is located in an agricultural zone (AR-1), where free-standing wireless facilities are allowed with a Special Exception and a Commission Permit. JA301-02[§5-618(B)(2)(a)], 1338. On August 6, 2010, T-Mobile filed its application for a Special Exception and a Commission Permit for the Stephens Silo Site at a height of 125 feet. JA1580-81.

Under the Loudoun County Zoning Ordinance, a silo is a permitted use in an AR-1 zone and only requires a zoning permit confirming that setbacks are met (T-

8

Mobile's proposed silo meets setbacks). JA178-179. Section 1-103(D)(2) of the Loudoun County Zoning Ordinance exempts silos from any height limitations found in the Zoning Ordinance. JA174-77, 1583-84. Accordingly, the proposed silo at Stephens' farm, without antennas, would be a permitted use. In T-Mobile's proposal, all antennas would be fully hidden inside the silo. JA1350.

T-Mobile's application for the Stephens Silo Site was subject to public hearings and work sessions before the Planning Commission, the Board, and the Board's Transportation and Land Use Committee. JA1332-61, 1366, 1444-57. Throughout the process, T-Mobile repeatedly provided additional information in response to requests by the Board, Planning Commission, and Loudoun County Planning Department Staff ("Staff"). JA1387-88, 1481-84, 1493-1515, 1559-68. In response to input from the County and the public, T-Mobile made multiple changes to the proposed silo, including lowering its height from 125 feet, to 100 feet, then to 90 feet, and even agreeing to investigate lowering it to 80 feet. JA1216-17, 1252, 1255, 1276-81, 1294-96, 1380-1417. T-Mobile agreed to the County's request to change the diameter of the silo from 30 feet to 24 feet. *Id*. T-Mobile also agreed to install a ground building compatible with a farm environment to house equipment, and to limit future collocation from five carriers to three. JA1246-47.

Staff provided multiple reports, all finding that T-Mobile's applications satisfied County requirements and should be granted. JA1251-81, 1338-61, 1380-1417, 1458-79. The Planning Commission, after a hearing and a work session, concurred with Staff that T-Mobile's applications should be approved. JA1366.

During the hearings, the Planning Commission and Board repeatedly heard comments opposing the facility based on fears of RF emissions, including people referring to T-Mobile's search area as the "ring of death." JA1448-52. Supervisors Kurtz and Miller both also echoed their concerns about RF emissions. JA1219-21, 1308-09, 1328-32. The Board highlights public comments about the size and visibility of the proposed silo. (Board Br. 13-14.) However, the Board ignores that the citizens made clear that they were unabashedly anti-wireless – regardless of the form of the facility – repeatedly questioning the need for a T-Mobile facility in the area, (JA1448-51), stating "a cell phone tower in itself is bad." JA1448; *see also* JA1451-1452. Yet, neither the Comprehensive Plan nor the Zoning Ordinance requires a showing of need for a particular facility. (*See* Bd. Br. at 8-11.)

The Board's brief mischaracterizes the discussion of the tree coverage around the Stephens Silo Site at the July 11, 2011 Board meeting when it says that "concern was expressed about the visibility of the proposed silo and the scarcity of trees in the vicinity of the proposed silo to screen its visual impact from other

10

properties." (Board Br. 15.) That portion of the transcript shows some initial confusion about why the nearby trees were being discussed, but that confusion was resolved when Supervisor Kurtz made clear her inquiry was about RF coverage, not tree buffering. JA1302-05.

The Board also overstates Supervisor Kurtz's statements regarding the existing Simpson Farm silos. (Board Br. 16.) While Supervisor Kurtz "assumed" that the property was no longer in foreclosure and was an alternative, she provided no evidence in support and never concluded that it was actually available to T-Mobile. JA1222. Supervisor Kurtz *was* clear that she spoke to citizens about the proposed silo and they were focused on fears of RF emissions. JA1219, 1221 (Kurtz stating "most directly affected by this, are quite concerned about increased [RF] emissions. . . . they have children that play outside too. And so they're quite concerned about this point of presence with continual emissions. . . . This is incessant").

Without acknowledging T-Mobile's final agreement to study lowering the silo to 80 feet, at the October 17, 2011 Board meeting, Supervisor Kurtz made a single oral motion to deny both the Commission Permit and Special Exception application for the Stephens Silo Site. The Board's Brief mischaracterizes the motion, attempting to re-organize it to match the Board's current arguments. (Board Br. 16-17.) The full motion stated:

I move that the Board of Supervisors overturn the decision of the Planning Commission and deny the Commission Permit 2010-0009, T-Mobile Stephens silo, and deny Special Exception 2010-0020, T-Mobile Stephens silo, based on the following findings:

The Commission Permit.  The proposed project is not fully consistent with the land use policies of the revised general plan and strategic land use plan for telecommunications facilities.

The 1996 strategic land use plan for telecommunications facilities recommends any new commercial telecommunication antennas in the rural areas first located on existing towers and buildings or other tall structures within a two mile radius.  Currently there are existing agricultural silos within a two mile radius on which to locate telecommunications antennas which are preferred locations as outlined in the telecommunications plan.  For the special exception, the proposed design and siting has not mitigated its significant structural presence, thus creating an unnecessary visual impact on surrounding properties.

Number 2.  The proposed silo height of 90 feet does not blend with the natural and built environment of the surrounding area.  The height and appearance is not in keeping with the silos and other farm structures in the immediate vicinity.

Number 3. A denial does not have the effect of prohibiting the provision of personal wireless services in this area of the County with current services available from T-Mobile and others.

JA1184-86.  The Board's attempt to create a distinction between the Special

Exception and Commission Permit simply is not supported by the text of the

motion.

12

After Supervisor Kurtz made her motion, Supervisor Miller offered an amendment to add the environmental impact of RF emissions as ground for denial number four.  JA1186.  Supervisor Miller's "friendly amendment," which he represented was prohibited by the Telecommunications Act, was accepted and made a part of Supervisor Kurtz' single motion.  The only discussion of the Board's motion to deny was Supervisor Miller's explanation of why he was adding negative environmental impact from RF emissions as a reason for denial.  JA1186-89.  After Supervisor Miller's explanation of the meaning of and reason for his amendment, the full Board held a single vote to approve the motion to deny both applications for the Stephens Silo Site.  JA1189.

## III.  THE BELL TOWER SITE

### A.    Application

Pursuant to industry practice, T-Mobile's RF engineers created a "search area," within which a new facility must be located to remedy the deficiency in coverage around the Bell Tower Site.  JA166, 1177 .  Consistent with the County's requirements, T-Mobile originally searched for existing structures on which it could co-locate a facility within the search area and, as a result, pursued attaching antennas to an existing amateur Ham radio tower located at 17 Oak Lane.  JA166-67, 585-87, 1168-72.  The County, however, informed T-Mobile that it could not

13

attach to that structure because the tower had never been permitted.  JA167, 1173-76 .

Next, T-Mobile investigated the possibility of locating a wireless facility on the roof of the Potomac Garden Apartments on Potomac View Road.  JA167, 992-93.  The apartment buildings were not tall enough to remedy T-Mobile's coverage deficiency, and they could not structurally support T-Mobile's facilities.  *Id*.  There are no other existing structures of sufficient height within the "search area" on which T-Mobile could co-locate its facilities.  *Id*.; JA593, 662, 666, 686-91.

The districts within T-Mobile's "search area" are zoned Countryside Residential (CR-1), Residential (R-1 or R-4), or Planned Development Housing (PDH).  JA168, 1177, 1179.  The County Zoning Ordinance does not permit free-standing wireless facilities in either R or PDH zones, but does permit free-standing wireless facilities in CR-1 zones with a special exception and a commission permit.  JA301-02 [§5-618(B)(2)(a)].

There is only one area zoned CR-1 within T-Mobile's search area.  T-Mobile identified the Church property, which is both zoned CR-1 and within the search area, entered an option agreement with the Church, and on April 25, 2008 filed an application for a Special Exception and a Commission Permit to construct an 80 foot wireless facility in the southwest corner of the Church parking lot, camouflaged as a light-pole.  JA1111-18.

14

T-Mobile's application for the Bell Tower Site was subject to review, public hearings, and work sessions before the Planning Commission, the Board, and the Board's Transportation and Land Use Committee. JA604-50, 686-718, 731-34, 756-61, 763-81, 804-27, 974-76, 1159-67. Throughout the process, T-Mobile repeatedly provided additional information in response the requests by the Board, Planning Commission, and Staff. JA979-84, 1016, 1033-36, 1064-69, 1096-1106. Indeed, in response to input from the County and the public, T-Mobile considered a variety of alternatives to the initial proposal – including a flagpole, tree-pole, and steeple[1] installation – and ultimately changed its proposal to the bell tower design with the antennas completely hidden, which was preferred by Staff. JA168, 331, 979-84, 1002-16, 1037-41, 1044-61, 1070-76. T-Mobile also investigated the existing utility poles on Potomac View Road, but they are not tall enough to remedy T-Mobile's coverage deficiency, and in any event, the pole owner's rules prohibit their use. JA169, 585-87.

Staff provided multiple reports, ultimately finding that T-Mobile's application satisfied all County requirements and should be granted. JA588-603, 651-69, 783-98, 831-36, 958-73. The Planning Commission, after multiple hearings and work sessions, concurred with Staff and recommended the Bell Tower Site be approved. JA761.

---

[1] The Church refused to allow T-Mobile to reconstruct the existing building to install a facility concealed within a taller replacement steeple. JA168, 324-25.

15

T-Mobile's applications were considered by the Board at two hearings and two business meetings. JA604-50, 692-718, 1159-67. The Board received a report from Staff concurring with the Planning Commission's recommendation to approve the Bell Tower Site. JA651-69, 686-91. The Board also was informed by the Planning Commission that the proposed Bell Tower was like one previously constructed by the Dranesville United Methodist Church and that the Church could build an identical bell tower only six feet shorter that did not have antennas as a matter of right. JA731. Indeed, the Planning Commission informed the Board that the Church could by-right build a bell tower even taller than the proposed 80 feet by locating at a slightly different location on the property. *Id.*

The Board heard testimony from Staff, T-Mobile, and members of the public. JA617-50, 1159-67. The overwhelming focus of the public comment both explicitly and indirectly centered on fears of RF emissions. (*See infra* Section VI.C.; JA685, 726-30, 744-55, 828-30, 840-72. Contrary to the Board's portrayal, public opposition to the Bell Tower Site was not "unanimous." In fact, numerous community members and associations expressed support for the Bell Tower Site. JA670-82. Indeed, one community member in support characterized the opposition as a "vocal extremist minority." JA680.

At an October 4, 2011 Board Business Meeting, Supervisor McGimsey moved to deny the Bell Tower Site. JA604. Several Supervisors made brief

16

comments on the motion, and the motion was passed to deny the Bell Tower Site.

JA606-16.

**B.    Bell Tower Site Option Agreement**

The Board's description of the Tower Lease With Option Agreement

("Option Agreement") is inaccurate.  T-Mobile's current right to the property

exists as an option to enter into a lease.  JA326-27, 526-27, 584, 937, 1042-43,

1119-32.  The Option Agreement requires the Church to cooperate with T-

Mobile's attempts to obtain all necessary permits.  JA326-27, 1119.  The Option

Agreement provides that ***upon exercise of the option***, T-Mobile will lease the

tower and property "generally described and depicted" in a lease exhibit, (*id*.), and

that

> [t]he parties understand and acknowledge that Exhibits A
> and B may be attached to this Lease and the Memorandum
> of Lease, in preliminary form.  Accordingly, the parties
> agree that upon the preparation of final, more complete
> exhibits, Exhibits A and/or B, as the case may be, may be
> replaced by Tenant with such final, more complete
> exhibit(s).

JA1123 [§18(j)].  The Board's recitation of facts and argument ignores that

provision and the fact that the Church expressly agreed to the change in design

from the original proposal in the southwest corner of the parking lot to the

proposed Bell Tower Site in the parking lot island.  JA324-328, 1037-41, 1056-58.

## SUMMARY OF THE ARGUMENT

The rapid deployment of modern wireless communications facilities and services is critical to the economic and policy goals of the nation and to the demand of consumers.  In the Telecommunications Act of 1996, Congress adopted a sea change in the communications industry designed to promote that rapid deployment of communications facilities and services.  Even in 1996, Congress recognized that local review of wireless facilities was a significant impediment to fulfillment of national policy goals.  Although Congress rejected proposals to completely eliminate local involvement, to promote deployment, Congress adopted provisions that limit the traditional authority of local governments.

In this case, despite the fact that T-Mobile has proposed facilities that will have no visible antennas and would be permitted without discretionary review absent the hidden wireless elements, the Board has denied T-Mobile's applications for the Stephens Silo Site and the Bell Tower Site.  Those denials exceed the limitations created by Congress in multiple respects.

The District Court correctly held that the Board's denial of the Stephens Silo Site was explicitly and unlawfully based on the environmental effects of RF emissions, in violation of 47 U.S.C. §332(c)(7)(B)(iv).  JA148-52.  The clear and unequivocal statements of Supervisor Miller, which were then adopted in the vote of the entire Board, articulate that the Board is denying the Stephens Silo Site

18

because of residents' fears of RF emissions.  Indeed, Supervisor Miller admitted that in other cases, RF emissions were the real reason for denial but the Board would articulate "lawful" reasons as a subterfuge.  The Board's mischaracterization of the facts cannot change the Board's reason for denial. Moreover, the District Court correctly rejected the Board's argument that the articulation of potentially lawful reasons for denial negates the violation of Section 332(c)(7)(B)(iv).  The legislative history and majority of cases recognize that a denial violates Section (B)(iv) whether directly or indirectly based on RF emissions.  The Board's argument that RF emissions must be the sole ground for denial would effectively eviscerate Section (B)(iv).  The District Court also correctly rejected the Board's argument that the RF emissions issue was only applicable to the Special Exception.  Contrary to the Board's assertion, the District Court correctly found, based on the facts of the case, that the Board had treated both the Commission Permit and Special Exception as a single matter, under a single motion.  An injunction requiring the Board to grant the applications is the proper remedy for the violation of Section 332(c)(7)(B), as recognized by many courts.

The District Court erred in holding that the denial of the Bell Tower Site did not have the effect of prohibiting T-Mobile from providing service in violation of Section 332(c)(7)(B)(i)(II).  This case presents the Court with an opportunity to

19

further clarify the law of this circuit.  Just last year, in *T-Mobile Northeast LLC v. Fairfax County Bd. of Supervisors*, 672 F.3d 259, 266 (4th Cir. 2012), the Court clarified that "a plaintiff can prevail [on an effective prohibition claim] by demonstrating that the denial of an application for one particular site is 'tantamount' to a general prohibition of service" by "showing both an effective absence of coverage, and a lack of reasonable alternative sites to provide coverage." *Id.*  In *Fairfax County*, as the dissent noted, because the Court disposed of the appeal based on the "lack of reasonable alternative sites" element, the Court's limited discussion regarding an effective absence of service was dicta and not fully developed.  In this case, it is established that T-Mobile has an "effective absence of coverage" in its ability to provide "in-building" wireless service. Moreover, it is established, based on expert testimony, case law, and FCC usage, that the inability to provide reliable in-building service is an effective lack of service.  Disregarding all the supporting authorities, the District Court incorrectly found that any level of signal in the area means that T-Mobile is able to provide service and cannot demonstrate an effective prohibition of service.

Moreover, the Court erroneously accepted the Board's assertion that there may be other alternatives available, even though T-Mobile had investigated and ruled out those locations as not feasible and/or available.  The District Court's conclusion that T-Mobile had reasonable alternatives is based on the erroneous

20

premise that T-Mobile does not need to provide reliable in-building service. The District Court also improperly rejected the testimony of T-Mobile's expert that the RF propagation estimates underlying the testimony of the Board's witness about alternatives were erroneous and unreliable. At a minimum, the District Court was required to determine that there is a genuine issue of material fact regarding the feasibility of alternatives.

In denying Counts 1 and 4, the District Court's decision erroneously concluded that the Board's denials of both sites were supported by substantial evidence. Both the Bell Tower Site and the Stephens Silo Site propose the installation of structures that – but for the presence of antennas that would be completely hidden – would be permitted "by-right." Silos are permitted by right on agricultural property, with no limitation on height. Likewise, the Church could construct a free standing bell tower of the same design on its property by-right (indeed, even taller depending on the location on the property), as confirmed by the Planning Commission. With those underlying premises in mind, both proposals were subjected to thorough evaluation and scrutiny by the Staff and the Planning Commission before they were considered by the Board. T-Mobile's submissions and responses to questions posed by the Staff, the Planning Commission, and members of the community demonstrated that both the Bell Tower Site and the Stephens Silo Site were well designed to fit within the surroundings and in

21

compliance with the County's Comprehensive Plan, Zoning Ordinance, and all applicable requirements.  In each case, both the Staff and the Planning Commission found that the proposals satisfied all of the County's requirements and recommended approval of the sites.  Given that the structures would be permitted if not for the antennas hidden inside, the opposition to the proposals can only be considered generalized opposition to wireless facilities – and fundamentally fear of the RF transmission.  However, such generalized opposition is not substantial evidence supporting denial under Section 332(c)(7)(B)(iii).

For similar reasons, the District Court erred in denying Count 3, finding that the denial of the Bell Tower Site was not based on fear of RF emissions.  JA143-48.  Denial of the Bell Tower Site denial is an example of the subterfuge admitted by Supervisor Miller during discussion of the Stephens' Silo Site.  The Bell Tower Site antennas would not be visible, and public opposition was largely based on concerns related to RF emissions and wireless in general.  Since the Board was told by the Planning Commission that a bell tower identical in design, and only a few feet shorter, but without hidden antennas, could have been constructed by right by the Church, the only real issue of concern must have been RF emissions.

Accordingly, the District Court's decision granting summary judgment to the Board on Counts 1-4 should be reversed, and judgment should be ordered for T-Mobile on all counts.

## ARGUMENT

## I.   STANDARD OF REVIEW

T-Mobile agrees that review of a grant of summary judgment is de novo.  *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1992)(en banc).  Further, T-Mobile agrees that in a *de novo* review of a decision granting summary judgment, the Court must draw all reasonable inferences in favor of the party appealing the grant of summary judgment.  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)(en banc).  However, in this cross-appeal, in which the Board is nominally the appellant and T-Mobile is nominally the appellee, the party in whose favor inferences are drawn shifts according to the issue being appealed.  *See id*.  The reviewing court must view the record in the light most favorable to the nonmoving party below.  *Monumental Paving & Excavating, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## II.   THE TELECOMMUNICATIONS ACT OF 1996

The Board attempts to characterize the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, which amended the federal Communications Act of 1934 (the "Act"), as an essentially pro-municipality statute that adopted provisions designed to empower and defer to local governments on the issue of wireless facilities deployment.  The Board's version of the statute conflicts with

the language and the legislative history, as recognized by the United States Supreme Court.

The Act was designed "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996); *see also City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005); H.R. Conf. Rep. No. 104-458, at 113 (1996)(the purpose of the Telecommunications Act is "to provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition"). The FCC has confirmed that "the promotion of advanced services and competition . . . [was] deemed critical in the Telecommunications Act of 1996 and more recently in the Recovery Act." *Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance*, 24 F.C.C.R. 13994, ¶ 35 (2009)("*Declaratory Ruling*")(citing Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), codified at 47 U.S.C. §151

*et seq.*, and American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009)).

Even in 1996, Congress identified the local government approval process as one of the key impediments to the rapid deployment of wireless services. In drafting the provision that ultimately became Section 332(c)(7) of the Act, the U.S. House of Representatives concluded that "current State and local requirements, siting and zoning decisions by non-federal units of government, have created an inconsistent and, at times, conflicting patchwork of requirements which will inhibit the deployment of" wireless services. H.R. Rep. No. 104-204, pt. 1, at 95 (1995).

To address the concern about local impediments – without eliminating the role of local authorities altogether – Congress adopted a carefully crafted balance in Section 332(c)(7). Section 332(c)(7) contains two parts. In the first part, entitled "General authority," Section 332(c)(7)(A) preserves the residual zoning authority of State and local governments "over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. §332(c)(7)(A). However, in the second part, entitled "Limitations," Section 332(c)(7)(B) "imposes specific limitations on the traditional authority of [S]tate and local governments to regulate the location, construction, and modification of such facilities." *Abrams,* 544 U.S. at 115.

Specifically as it relates to this appeal, subsection (B)(iv) provides that "[n]o State or local government . . . may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of [RF] emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."  47 U.S.C. §332(c)(7)(B)(iv).  Further, Section 332(c)(7)(B)(iii) requires that a local siting decision must be supported by "substantial evidence" in the record.  47 U.S.C. §332(c)(7)(B)(iii).  Section (B)(i)(II) provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. §332(c)(7)(B)(i)(II).

Accordingly, although it preserved a role for local authorities, Congress adopted specific provisions designed to limit the authority of local governments and ensure that local authorities do not impede deployment of wireless facilities. As recognized by the Supreme Court, the goal of Section 332(c)(7) "***was reduction of the impediments imposed by local governments*** upon the installation of facilities for wireless communications, such as antenna towers . . . [through] ***impos[ition of] specific limitations on the traditional authority*** of state and local governments to regulate the location, construction, and modification of such

facilities." *Abrams*, 544 U.S. at 115 (emphasis added); *see also, e.g., APT Pittsburgh, L.P. v. Penn Twp.*, 196 F.3d 469, 473 (3d Cir. 1999) (the Act "places several substantive and procedural limits upon [local zoning] authority when it is exercised in relation to personal wireless service facilities").

The Board's assertion that the "overarching purpose" of Congress was to "preserve, not preempt, local zoning authority" (Board Br. 27), is inconsistent with the statute and legislative history, as recognized by the Supreme Court. Congress did not need to adopt Section 332 if its sole purpose was to preserve existing authority. As the Supreme Court has recognized, the "overarching purpose" of the Act was the promote the deployment of telecommunications facilities and services, and the purpose of Section 332(c)(7)(B), in particular, was to limit traditional authority. *Abrams*, 544 U.S. at 115; H.R. Rep. No. 104-204, pt. 1, at 95.

## III.   T-MOBILE HAS STANDING TO BRING THIS CASE

Although the District Court ruled in the Board's favor on all counts concerning the Bell Tower Site, the Board asserts in its opening brief that T-Mobile lacks standing to bring Counts I-III, arising from the Board's denial of the Bell Tower Site. (Board Br. 45-60.) The Board's assertion is meritless.

The District Court correctly held that T-Mobile has standing to bring its claims challenging the Board's denial of the Bell Tower Site because (1) the Option Agreement provides T-Mobile the ***option*** to lease property from the Church

to construct the proposed wireless facility disguised as a Bell Tower; (2) that property interest was harmed by the Board's denial; and (3) a reversal of the Board's denial will redress that harm.  JA127-29.  The Board's argument hinges on its assertion that T-Mobile never got Church approval of the amendments to the application.  (*See* Board Br. 45-60.)  This argument relies on the false presumption that changing the design required an amendment to the Option Agreement, and ignores the irrefutable fact that the Church approved the final bell tower design.

As a threshold matter, the Board ignores Section 332(c)(7)(B)(v), which provides that "Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction."  47 U.S.C. §332(c)(7)(B)(v).  T-Mobile's standing fundamentally stems from this provision of the Act, not traditional property law.  T-Mobile is adversely affected by the Board's denial and is the proper party to maintain this action under Section 332(c)(7)(B)(v).  Of particular note, the Board did not assert as grounds for denying its applications that T-Mobile did not have a property right.  JA.

Nonetheless, it is clear that T-Mobile does have a protected property interest adequate to maintain this case.  T-Mobile's property interest is in the form of an option to lease part of the Church's property.  JA326-27, 526-27, 584, 937, 1042-

28

43, 1119-32.  It is standard practice for wireless site leases to take the form of

option agreements because it allows the provider to work cooperatively with the

government and property owner without the need to renegotiate a lease with every

alteration.  JA326-27.

     Accordingly, the Option Agreement provides that the Church will cooperate

with T-Mobile on "all licenses and permits or authorizations required for Tenant's

use of the Premises . . . including all land use and zoning permit applications, and

Landlord agrees to cooperate with and to allow Tenant, at no cost to Landlord, to

obtain a title report, zoning approvals and variances, land-use permits."  JA128,

327, 1119.  The Board argues that the Church's obligation to cooperate with the

permitting process did not bind the Church to agree to any modifications that may

result from that process.  (Board Br. 50-51.)  Yet, the Board ignores that the

Church participated in the modification discussions, and ***explicitly approved*** the

design and location of the proposed Bell Tower Site.  JA324-27, 1044-55.

     Moreover, the Board ignores the language of the Option Agreement that

makes clear that the parties contemplated change.  The Option Agreement provides

that if T-Mobile exercises its option, then the Landlord leases to T-Mobile the use

of the Tower and Property "*generally described* and depicted in the attached

Exhibit B."  JA1119 (emphasis added).  The Option Agreement originally included

three lease exhibits: Exhibit A provided a legal description of the property; Exhibit

29

B provided a proposed site plan that generally described and depicted the

"Premises" to be leased; Exhibit C was a Memorandum of Lease.  JA1119, 1125-

32.  Section 18(j) of the Option Agreement states that

> Exhibits A and B may be attached to this Lease and the
> Memorandum of Lease, in preliminary form.
> Accordingly, the parties agree that upon the preparation
> of final, more complete exhibits, *Exhibits A and/or B, as
> the case may be, may be replaced by Tenant with such
> final, more complete exhibits.*

JA1123 (emphasis added).  Exhibit B explicitly states "the purpose of this drawing

is for concept only.  All dimensions and/or locations shown are approximate."

JA1126.

Thus, T-Mobile and the Church contemplated precisely the sort of design

and location modifications that occurred here.  JA324-27, 1044-55.  Accordingly,

if and when T-Mobile exercises its option to lease Church property, the final and

complete Exhibit B showing the approved tower layout and design will define the

Premises of the lease.  Critically, and fatally, the Board ignores Section 18(j) of the

Option Agreement, which makes clear that the lease exhibits can be substituted or

modified *without* amending the Option Agreement, thus contradicting the very

premise for the Board's argument.  (Board Br. 47.)

The Board's final argument addressed to standing is really an appeal of the

Court's denial of the Board's Motion to Join or to Dismiss for Failure to Join a

Necessary Party.  The Board argues that because the Church will retain authority to

30

lease a portion of the "fenced-in compound," the Church is a necessary party. (Board Br. 58-59.) The Board cites no authority for this proposition and provides no reason why the District Court was mistaken in denying the Board's motion originally. Essentially, the Board's argument is that because the plans call for a fence around vacant space for potential future use by the Church, T-Mobile has no right to seek a remedy for the denial of its applications. Again, the Board's argument ignores that these claims are for violation of Section 332(c)(7)(B), not general property rights.

The Board also ignores Section 7(b) of the Option Agreement, which authorizes T-Mobile to construct a fence, "subject to Landlord's approval," in order to restrict access to its equipment. JA1120. The Option Agreement contemplates the potential for future collocation of additional wireless carriers. JA1122. Accordingly, the proposed site plan depicts a fence surrounding T-Mobile's ground equipment as well as vacant space that may be leased by potential co-locators. JA739, 1054. As the Church has confirmed, it expressly approved the site plans, including the depiction of the fence enclosing T-Mobile's equipment and the vacant space reserved for future use. JA324-27, 1044-55.

The District Court correctly held that the Option Agreement grants T-Mobile a property interest in the Bell Tower Site, that property interest was harmed by the Board's denial of T-Mobile's application, and that harm will be redressed if the

31

Board's denial is reversed.  T-Mobile has standing to maintain this action under

Section 332(c)(7)(B).

## IV.  THE DISTRICT COURT WAS CORRECT IN FINDING THAT THE BOARD'S DENIAL OF THE STEPHENS SILO SITE VIOLATED 47 U.S.C. § 332(c)(7)(B)(iv)

The Board's denial of the Stephens Silo Site intentionally and explicitly

violated federal law.  Section 332(c)(7)(B)(iv) of the Act prohibits the Board from

regulating the placement of wireless facilities on the basis of the alleged

environmental effects of RF emissions.  47 U.S.C. §332(c)(7)(B)(iv).  Nonetheless,

Supervisor Miller offered an amendment to the Board's motion to deny by stating

"notwithstanding the prohibition on what I'm going to propose in the

Telecommunications Act of 1996.  I would ask that a fourth reason, negative

environmental impact, be included."  JA1186.  That amendment was accepted as

part of the motion, and Supervisor Miller then candidly explained his motivation

for proposing that the Board violate federal law, stating:

> Mr. Chairman, the reason I want to include that is
> because it is a prohibited basis under the
> Telecommunications Act of 1996 for local governments
> to consider.  *We've had speaker after speaker come in
> here and talk to us about their concerns of being
> exposed to radiation from an evolving, dynamic
> technology.*
>
> . . . .
>
> *Governments at our level all over the country do the
> same thing when they decide that's the reason to turn
> down one of these applications:  They lie.  They give a*

> *reason that's on the legal list when that's not what's on*
> *their mind.*
>
> I want this decided in a court of law . . . .

JA1187-89.  After Supervisor Miller's explanation, the Board voted to pass the

motion and deny the Stephens Silo Site.  JA1186-89.  Thus, the District Court

correctly found that "the Board's decision to deny the Stephens Silo application

was, at least in part, based on the environmental effects of RF emissions."  JA148.

### A.     The Board Is Not Free To Violate Federal Law By Also Offering Potentially Lawful Reasons For Denial

The Board argues that it should be allowed to violate Section

332(c)(7)(B)(iv) as long as it also identifies other grounds for denial that are

supported by substantial evidence.  (Board Br. 27-33.)  The District Court correctly

rejected the Board's argument and found that the language of the act makes clear

that a denial "based even partially on the environmental effects of RF emissions"

violates the Act.  JA150.

Whether a denial violates Section 332(c)(7)(B)(iii)'s substantial evidence

requirement is independent of whether a decision violates Section

332(c)(7)(B)(iv)'s prohibition on denials based on RF emissions, just as they are

both independent of whether a decision effectively prohibits service in violation of

Section 332(c)(7)(B)(i)(II).  The Board's argument subsumes subsection (B)(iv)

into the substantial evidence requirement of subsection (B)(iii), effectively

eliminating it as a separate provision.  Under the Board's theory, the only question

33

a court would ever address is whether a denial is supported by substantial

evidence.  (Board Br. 30.)  That is neither what the statute says, nor what Congress

intended when it established separate and independent limitations in Section

332(c)(7)(B).  *See, e.g., Green Mountain Realty Corp. v. Leonard*, 2012 WL

3234407, at *13 (1st Cir. 2012)(finding a denial may be supported by substantial

evidence, yet still violate the Act); *T-Mobile USA, Inc. v. City of Anacortes*, 572

F.3d 987, 994-95 (9th Cir. 2009)(same).

Both the legislative history and established case law make clear that Section

332(c)(7)(B)(iv) prohibits both direct ***and indirect*** regulation based on concerns

related to RF emissions. *See* H.R. Conf. Rep. No. 104-458, 201 (1996); *California*

*RSA No. 4 v. Madera County*, 332 F.Supp.2d 1291, 1310 (E.D. Cal. 2003); *AT&T*

*Wireless of Cal., LLC v. City of Carlsbad*, 308 F.Supp.2d 1148, 1159-60 (S.D. Cal.

2003).  Permitting localities to deny personal wireless service facilities based on

concerns related to RF emissions as long as some other reason is mentioned would

invite the precise subterfuge Supervisor Miller admitted when he stated that local

governments "lie" and give a reason that's on the "legal list when that's not what's

on their mind." JA1188.  Indeed, many cases have found that a local government's

denial improperly was based on RF fears, even when that was never directly stated.

*See Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 495 (2d Cir. 1999);

*New York SMSA LP v. Village of Mineola*, 2003 WL 25787525 (E.D.N.Y. Mar. 26,

2003); *Madera County*, 332 F.Supp.2d at 1310; *Carlsbad*, 308 F.Supp.2d at 1159-60.

The two cases cited by the Board do not support the Board's position. (Board Br. 30-32 (citing *Iowa Wireless Servs. L.P. v. City of Moline*, 29 F.Supp.2d 915 (C.D. Ill. 1998); *Oyster Bay*, 166 F.3d 490.)  While *Moline* does state that a local authority can deny a wireless application based on RF emissions so long as the decision articulates other, valid, reasons as well, 29 F.Supp.2d at 924[2], that very early case was in error.  The Act makes no such exception, as other cases have now found.  Section 332(c)(7)(B)(iv) prohibits regulation on the basis of environmental effects of RF emissions, without qualification or limitation.  There is no indication that the prohibition applies only to regulations based ***solely*** on RF.

Moreover, the Board mischaracterizes the Second Circuit's decision in *Oyster Bay*.  The Second Circuit did not hold that, or even address whether, a Section 332(c)(7)(B)(iv) violation could be found *only* if RF emissions were the

---

[2]  *Moline* contains no discussion of the Court's interpretation of Section 332(c)(7)(B)(iv), and ultimately, ordered the City to grant the permits because the denial was not based on substantial evidence.  *Id*. at 923-24.  Thus, its interpretation of Section 332(c)(7)(B)(iv) was never challenged.  Moreover, *Moline*, an early case interpreting the Act, doubted whether the consideration of "health concerns" falls within the Act's prohibition, *id*. at 924, which has been roundly rejected.  *See, e.g., AT&T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 431 n.6 (4th Cir. 1998); *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 88 (2d Cir. 2000); *Merrick Gables Ass'n v. Town of Hempstead*, 691 F.Supp.2d 355, 362-63 (E.D.N.Y. 2010); *Oyster Bay*, 166 F.3d at 495; *Village of Mineola*, 2003 WL 25787525.

sole basis for denial. *Oyster Bay* did not involve a denial explicitly based on RF emissions. Thus, the court had to examine the record and determine the basis for denial, then determine if there was substantial evidence to support the denial. 166 F.3d at 494. In that context, the court commented, "when the [public] testimony is almost exclusively directed to health effects, there must be substantial evidence of some legitimate reason for rejecting he applications to avoid the conclusion that the denials were based on impermissible health effects." *Id.* at 495. The court did not consider whether fear of RF emissions *must* be the "sole" grounds for denial, because when they examined the possible grounds for denial all they found was fear of RF emissions. *Id*. at 495-97. Accordingly, *Oyster Bay* does not adopt *Moline*'s construction of Section 332(c)(7)(B)(iv). It simply notes that the Act is violated if, as was the case in *Oyster Bay*, the sole basis for denial was negative environmental effects of RF emissions. *Id*. at 495. That is quite different than saying the ***only*** way the Act can be violated is if the denial is ***solely*** based on RF emissions.

Thus, *Oyster Bay* does not "trump" or conflict with the analysis of Section 332(c)(7)(B)(iv) in *T-Mobile Northeast LLC v. Town of Ramapo*, 701 F.Supp.2d 446, 460 (S.D.N.Y. 2009). Unlike *Oyster Bay*, in *Ramapo*, the court was presented with the question of what constitutes a violation of Section 332(c)(7)(B)(iv). 701 F.Supp.2d at 460. *Ramapo* rejected *Moline*, holding that "the better and more

straightforward reading of the provision [§332(c)(7)(B)(iv)] – which does not

contain a qualifying word like 'solely' – is that any decision actually based on

environmental effects is a violation, *whether other legitimate reasons factored into*

*the decision or not*."  *Id*. at 460 (emphasis added); *see also Firstenberg v. City of*

*Santa Fe*, 782 F.Supp.2d 1262, 1271 (D.N.M. 2011) (citing *Ramapo* for the

proposition that "denying a variance for a cell tower due ***in part*** to health concerns

related to RFE" is a violation of 332(c)(7)(B)(iv) (emphasis added)).

### B.    The Stephens Silo Site Was *Explicitly* Denied Based On The Perceived Negative Environmental Impact of RF Emissions

The District Court correctly rejected the Board's untenable argument that the

Stephens Silo Site was not denied on the basis of the environmental effects of RF

emissions.  (Board Br. 38-41.)  The Board's speculation that other Supervisors may

have misunderstood the meaning of Supervisor Miller's amendment is groundless

after a complete review of the transcript.  Supervisor Miller prefaced his proposed

amendment by saying that his proposal was prohibited by the Telecommunications

Act.  JA1186.  Moreover, while it came after the amendment was accepted as part

of the motion, Supervisor Miller's detailed explanation came ***before*** the motion

was put to a vote.  JA1189.  Thus, there can be no doubt that the Board understood

the meaning and impact of Supervisor Miller's amendment when it voted.

Moreover, the Board's argument that "no other supervisor . . . expressed any

37

concern about RF emissions or 'radiation,'" is false.  At a prior Board hearing,

Supervisor Kurtz noted citizens' concerns about RF emissions.  JA1219-21.

*Board of Zoning Appeals v. CaseLin Sys.*, 501 S.E.2d 97 (Va. 1998), does

not support the Board's position.  Unlike *CaseLin,* this case does not involve a

single, rogue Board member purporting to act "on behalf of the Board," but

without any authorization to do so.  *Id.* at 399, 401-02.  Here, the Board heard

Supervisor Miller's explanation, then voted to approve the motion.  Thus, the

Board as a whole adopted the RF emissions justification.  JA150-51, 1188-89.

Finally, the Board comments that the District Court did not explain why the

Board would break the law now when it had not previously.  (Board Br. 41.)

While neither the District Court, nor T-Mobile can be asked to explain why the

Board chose to explicitly admit to breaking the law now, even as a rhetorical

device this question damns the Board.  As Judge Lee highlighted at oral argument,

it appears that Supervisor Miller was fed up with federal law not allowing them to

admit they are acting based on RF related issues, and he wanted to violate the law

in an attempt to challenge it.  JA108.

### C.    The Board Denied The Stephens Silo Site In A Single Action

The District Court also correctly rejected the Board's assertion that only the

Special Exception was denied based on RF emissions.  (Board Br. 33-38.)  The

District Court correctly rejected this argument because it found that the denial

38

"constituted a single unlawful decision that cannot be justified by division into two separate decisions." JA151. Contrary to the Board's argument that the District Court "melded" the two permits, based on the factual record, the District Court concluded that the Board treated, and denied, the Stephens Silo Site as a single application, regardless of whether there were separate permit requirements. JA151-52.

The Board's attempt to re-organize the oral motion is not supported by the hearing transcript. Supervisor Miller's amendment was "number 4" in the list of reasons cited as grounds to "deny the Commission Permit 2010-0009, T-Mobile Stephens silo, and deny Special Exception 2010-0020." JA1184-86. Supervisor Kurtz combined the two applications in her motion. *Id.* There is, and can be, no logical connection between the substance of Supervisor Miller's amendment and only the Commission Permit *or* the Special Exception requirements, and to assign it to one and not the other is arbitrary, does not reflect how the Board actually considered the Stephens Silo Site and would evade the purpose of the Act.

### D.     An Injunction Is The Appropriate Remedy

Without citing any authority, the Board asserts that "[t]he 'RF emissions' clause does not create an independent cause of action." (Board Br. 41.) To the contrary, Section 332(c)(7)(B)(v) provides an independent cause of action for

"[a]ny person adversely affected by any final action . . . that is inconsistent with this subparagraph."  47 U.S.C. §332(c)(7)(B)(v).

The District Court fully considered the appropriate remedy and found, consistent with numerous other courts, that an injunction is the appropriate remedy in this case.  JA152-54 (citing numerous courts approving injunctive relief).  The Board's hypotheticals and hyperbole regarding a "virtual 'death penalty'" are irrelevant and overblown.  (Board Br. 32-33, 41-44.)  The Board's protest that the District Court's decision "subvert[s] the statutory scheme for the CMPT and the SPEX," (Board Br. 43), fundamentally misconstrues Section 332(c)(7)(B) and cannot undermine the District Court's ruling.  The District Court's examination into the impact of the injunction did not usurp the Board's authority, it simply measured the appropriateness of the remedy.  More importantly, the point of Section 332(c)(7)(B) is precisely to preempt local laws and actions that conflict with federal law.  Section 332(c)(7)(B) limits the Board's authority, so that even if the Board complied with local and state processes, it still must comply with federal law.  Because the Board denied the Stephens Silo Site in violation of federal law, its action must be overturned.  As the Sixth Circuit recently recognized, a state or local authority could not subvert Section 332(c)(7)(B) by complying with a state or local law that conflicts with the limits of Section 332(c)(7)(B).  *T-Mobile Cent., LLC v. Charter Twp. of West Bloomfield*, 691 F.3d 794, 799 (6th Cir. 2012).

40

Ultimately, a remedy that remands the application to the local government to give them an opportunity simply to adopt a new order that does not state the offending grounds for denial would subvert the intent of the Act and would force the Board to do exactly what Supervisor Miller stated is the problem: lie about the grounds for denial.  JA1187-89.  *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1222 (11th Cir. 2002)(an injunction is the appropriate remedy and remand would serve no useful purpose); *Brehmer v. Planning Bd. of Town of Wellfleet*, 238 F.3d 117, 120-22 (1st Cir. 2001)(same); *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 181 F.3d 403, 409-10 (3d Cir. 1999)(same); *Oyster Bay*, 166 F.3d at 497 (same).

The District Court's injunction should be upheld.

## V.  THE DISTRICT COURT ERRED IN HOLDING THAT THE BOARD'S DENIAL OF THE BELL TOWER SITE DID NOT PROHIBIT, OR HAVE THE EFFECT OF PROHIBITING, T-MOBILE'S PROVISION OF PERSONAL WIRELESS SERVICES IN VIOLATION OF 47 U.S.C. § 332(c)(7)(B)(i)(II)

### A.    The Effective Prohibition Standard

Section 332(c)(7)(b)(i)(II) of the Communications Act provides that

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government of instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C. §332(c)(7)(B)(i)(II).

Recently, this Court clarified that "a plaintiff can prevail on an effective prohibition claim by demonstrating that the denial of an application for one particular site is 'tantamount' to a general prohibition of service" by "showing both an effective absence of coverage, and a lack of reasonable alternative sites to provide coverage." *Fairfax County*, 672 F.3d at 266. T-Mobile has satisfied that test in this case, and the District Court erred in holding that T-Mobile had not.

### B.    T-Mobile Has An Effective Absence of Coverage

This case presents the Court with the question of what constitutes an "effective absence or coverage" or "legally cognizable deficit in coverage" sufficient to support an effective prohibition claim under Section 332(c)(7)(B)(i)(II). In *Fairfax County*, the Court's description of what constitutes an "effective absence of coverage" was limited to "a legally cognizable deficit in coverage." 672 F.3d at 268. However, as Judge Davis noted in his dissent, "I discern no meaningful difference between what the majority calls an 'effective absence of coverage' (or elsewhere a 'legally cognizable absence in coverage,' or a 'legally cognizable deficit in coverage') and what a prior panel on which I served referred to as a 'significant gap.'" *Id.* at 276 (Davis, J., dissenting)(internal citations omitted). Moreover, as Judge Davis pointed out, the majority's discussion of what is an effective absence of coverage was dicta, but in any event cannot be read to limit an effective prohibition claim under Section

332(c)(7)(B)(i)(II) "to areas without any detectable RF signal." *Id.* at 277-80

(Davis, J., dissenting).  As Judge Davis recognized, every court that has decided

the issue has found that whether there is a significant gap in coverage cannot be

decided simply based on the mere existence of some RF signal in the subject area.

*Id.*

It is undisputed that T-Mobile lacks sufficient RF signal strength to provide

personal wireless services inside of buildings in an area around the Church.  T-

Mobile's RF engineering expert, Mr. Conroy, opined, based on RF propagation

studies and drive tests of actual signal strength, that T-Mobile lacked sufficient RF

signal to provide "in-building" service.  JA544-83.  The Board's RF witness, Ms.

Malone, generally agreed that T-Mobile lacks sufficient RF signal to provide in-

building service in the area.  JA404-11, 507-08.  Ms. Malone also confirmed Mr.

Conroy's testimony that the RF signal strength standards used by T-Mobile are

consistent with industry standards.  JA406-07, 507-08.

T-Mobile's expert on wireless consumers, Mr. Entner, opined – without

opposition – that consumers demand to be able to reliably make and maintain

wireless calls within their homes and offices, and as a result, if T-Mobile lacks

sufficient RF signal strength to reliably provide service within buildings, from

consumers' perspective, T-Mobile is not offering service.  JA535.  Mr. Entner's

opinion was supported by statistics regarding the growing number of American

homes that rely entirely on wireless phones and have no landline phone. Recent government reports show that about one out of every three American homes have "cut the cord" and now have only wireless telephones. JA532-34. Accordingly, the only evidence in this case is that to constitute "service" to consumers, T-Mobile must be able to provide service inside buildings.

Yet, the District Court and the Board contend that so long as T-Mobile has any measurable level of RF signal it cannot establish an effective prohibition of service in violation of Section 332(c)(7)(B)(i)(II). JA131-34. There is no evidence in the record in this case to support the District Court's and Board's assertion. The assertion that some minimal level of RF signal equals service is contradicted by the RF expert evidence and also by the uncontested evidence regarding what consumers consider viable "service." It is also contrary to the growing body of cases.

     **1.    If T-Mobile Is Not Able To Provide Reliable Service Inside Buildings, Consumers Will Not Consider It To Be Providing A Viable Service**

As demonstrated by Mr. Entner, a wireless provider that cannot offer reliable indoor service to consumers is effectively not offering service. JA535. Mr. Entner concluded that "reliable in-building wireless service is essential to American consumers and if a wireless provider, such as T-Mobile, is not able to provide

reliable in-building wireless service in an area, it will have a significant gap in and will effectively be unable to provide service."   JA530, 538.

The Board offered no rebuttal to Mr. Entner's report.  While Ms. Malone asserted that T-Mobile does not have a complete absence of signal, at deposition she admitted that her opinion was based on a very narrowly framed question by the Board's counsel: whether there was a complete "absence of service in the area around the proposed site."  JA390-94, 399-405.  Thus, she did not address whether an absence of "in-building" service amounts to an effective absence of service actionable under Section 332(c)(7)(B)(i)(II).  Indeed, when asked if she agreed with Mr. Entner's opinion that "in-building service needs to be provided to customers," Ms. Malone responded "that was not the question I was asked to give an opinion on."  JA396-97.[3]

Ultimately, Ms. Malone has testified in other cases that in-building service is the relevant standard for evaluating whether there is an effective prohibition of service.  JA413-15, 1136-58.  Specifically, in a case involving Lawrence Township, New Jersey, in which T-Mobile was a member of a consortium of

---

[3]  The Board's counsel objected to a question related to Mr. Entner's Report on the grounds that "she wasn't asked to opine as to Mr. Entner's report."  JA397.  More importantly, Ms. Malone admitted that her testimony about whether T-Mobile had an "absence of service" was not based on any legal standard or any RF engineering methodology.  JA404.  Accordingly, it was inadmissible.  *See Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)(expert opinion must be based on specialized knowledge and inferences derived from scientific methods).

wireless providers seeking to construct a wireless facility, Ms. Malone testified that

"***the de facto standard of in-building coverage*** is driven by how people are using

their phones and where users want their phones to work."  JA 1146-47 (emphasis

added); *see also* JA382-85, 387-88, 393, 413-15.  In that case, Ms. Malone

concluded that there was a gap in in-building coverage, and in fact did not even

consider outdoor coverage, "because that's what users – how users use their

phones."  JA1147-50.

### 2.  Multiple Courts Have Recognized That The Inability To Provide Reliable In-Building Service Creates A Legally-Cognizable Prohibition Of Service

In addition to the testimony from Mr. Enter, Mr. Conroy, and even Ms.

Malone, multiple courts around the country have held that in-building service is the

relevant standard for evaluating an effective prohibition of service claim.  *See, e.g.*

*MetroPCS Inc. v. City & County of San Francisco*, 2006 WL 1699580, at *10-11

(N.D. Cal.)(holding significant gap analysis should include consideration of a

wireless carrier's in-building coverage)(citing *Sprint Spectrum v. Willoth,* 176 F.3d

630, 643 (2d Cir. 1999)(measuring significant gap with regard to both in-vehicle

and in-building coverage)); *U.S.C.O.C. of N.H. RSA #2 v. Town of Dunbarton*,

2005 WL 906354 (D.N.H. Apr. 20, 2005); *see also American Cellular Network*

*Co. v. Upper Dublin Twp.*, 203 F.Supp.2d 383, 391 (E.D. Pa. 2002)(evaluating

evidence of significant gap that included propagation maps illustrating in-building coverage).

Most recently, in *T-Mobile West Corp. v. City of Huntington Beach*, 2012 WL 4867775, at *16 (C.D. Cal. Oct. 10, 2012), the court relied on Mr. Entner's testimony and held that a lack of in-building service establishes a lack of service for purposes of Section 332(c)(7)(B)(i)(II).[4]  The court in *Huntington Beach* held that "a gap in a provider's in-building coverage that consists of more than a few isolated pockets of inadequate in-building coverage suffices to show a significant gap exists."  *Id.* at *17; *see also T-Mobile West Corp. v. City of Agoura Hills*, 2010 WL 5313398, at *8 (C.D. Cal. Dec. 20, 2010)(citations omitted); *MetroPCS N.Y., LLC v. Village of East Hills*, 764 F.Supp.2d 441, 453 (E.D.N.Y. 2011); *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County*, 528 F.Supp.2d 1128, 1169 (D. Kan. 2007)("[I]n-building coverage may appropriately be considered as part of the significant gap analysis"), *aff'd in relevant part*, 546 F.3d 1299 (10th Cir. 2008); *Cingular Wireless, LLC v. Thurston County*, 425 F.Supp.2d 1193, 1195 (W.D. Wash. 2006); *Nextel Partners, Inc. v. Town of Amherst*, 251 F.Supp.2d 1187, 1196 (W.D.N.Y. 2003).

The Second Circuit considered the question of what constitutes service in *Willoth*, 176 F.3d at 641, where the court undertook a "detailed parsing of the

---

[4] The Court's holding in *Huntington Beach* relied on testimony from Mr. Conroy and Mr. Entner.  2012 WL 4867775, at *10-11.

statutory language, including layers of highly technical definitions," and concluded that "the parameters of the statutory proscription of local government's prohibition of 'personal wireless services' . . . depends upon a conception of 'personal wireless services' that is the equivalent of the ability of mobile, handheld telephones to reach a cell site that provides access to a land-line exchange and allows phone calls to be made to and from the national telephone network." *Id.*; *see also id.* at 642-43. The Second Circuit's analysis emphasizes that if a user cannot establish connections to the national network from their house because T-Mobile's signal is not strong enough, then T-Mobile has a legally cognizable deficiency in coverage (or gap in service).

### 3. Public Policy Supports The Need For Reliable In-Building Service Levels

The need for reliable in-building service levels is also supported by public policy that is reflected in various statutes and regulations. For example, the Wireless Communications and Public Safety Act of 1999 provides, in part, that "The Federal Communications Commission shall encourage and support efforts by States to deploy comprehensive end-to-end emergency communications infrastructure and programs, based on coordinated statewide plans, including ***seamless, ubiquitous, reliable*** wireless telecommunications networks and enhanced wireless 9–1–1 service." 47 U.S.C. §615 (emphasis added). Mr. Conroy testified that "[t]hese objectives are achieved by designing a network to supply

48

signal levels sufficient to support reliable communications in a given location (e.g. in-vehicle and in-building, where appropriate)."  JA468.

The provision of reliable in-building wireless communications was further emphasized by the FCC when it adopted its *Declaratory Ruling* in November 2009.  In that Order, the FCC, quoted the National Emergency Number Association, saying

> Calls must be able to be made from as many locations as possible and dropped calls must be prevented. This is especially true for wireless 9-1-1 calls which must get through to the right Public Safety Answering Point ("PSAP") and must be as accurate as technically possible to ensure an effective response.

*Declaratory Ruling*, 24 F.C.C.R. 13994 ¶36.  Mr. Conroy testified that the reference to "as many locations as possible" further justifies a level of reliability that includes in-building coverage.  JA469.

Ultimately, Mr. Conroy testified that

> The demand to provide in-building communications, for voice and data communications and for enhanced E-911 access, is a paramount requirement in today's wireless systems. Public Safety wireless communication networks are designed for 97% area coverage. It is therefore critical that the commercial carriers design their networks with similar reliability standards.

JA469 (internal citations omitted).

49

### 4. Federal Regulations Contemplate That Carriers, Such As T-Mobile, Will Establish The Relevant Signal Strength Standards

In its analysis, the District Court focuses with derision on the fact that the signal strength standards used by Mr. Conroy were "invented by T-Mobile." JA134. Yet, the FCC has specifically adopted policies and regulations that leave to carriers, such as T-Mobile, the responsibility for establishing technical parameters, including minimum RF signal levels necessary to constitute reliable service. In 1993, the FCC adopted regulations for what was then the new "personal communications service" (i.e. wireless "PCS") and concluded that "[i]n demonstrating compliance with construction and coverage requirements, we will *allow licensees to individually determine an appropriate field strength for reliable service* in the PCS system." *In the Matter of Amendment of the Commission's Rule To Establish New Personal Communications Services*, 8 F.C.C.R. 7700, 7754 n.106 (1993)(emphasis added)("*PCS Order*"); *see also id.* at 7774 n.130. In its most recent annual report to Congress, the FCC reiterated that "[t]he Commission largely has adopted flexible licensing policies to the extent that they do not mandate any particular technology or network standard for commercial mobile wireless licensees. *Mobile wireless service providers choose their own network technologies and services* and abide by certain technical parameters designed to avoid [RF] interference with adjacent licensees." *Annual Report and*

50

*Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Sixteenth Report, 2013 WL 1187836, at *72, ¶ 183 (FCC 2013) (emphasis added).  In other words, T-Mobile established the standards for its licensed frequencies and equipment specifically because that is what the FCC dictates.  The fact that T-Mobile has established the signal strength standards is not grounds for discounting those standards, particularly given the evidence of the scientific and technical grounds for the standards and the fact that the Board's expert concedes they are reasonable and consistent with industry standards.  JA406-07, 484-97.

The District Court also erroneously concluded that "A dropped call rate of 1.82% and access failure rate of 2.8% in buildings within a geographic area do not amount to an effective absence of coverage."  JA134.  The court's conclusory assertion is not supported by any evidence and clearly misunderstands the import of Mr. Conroy's testimony.  As Mr. Conroy's expert report makes clear, dropped call data is just one of many indicators that *verify* T-Mobile's effective absence of service.  As Mr. Conroy explained, RF experts consider the percentage of dropped calls and data regarding access failures, in particular from the antennas on surrounding sites that are aimed toward the gap area, as one measure of performance.  JA554-55.  An increase in dropped calls or access failures for the antennas aimed toward the gap can validate the RF studies and drive tests

indicating that there is an effective absence of signal. *Id*. But the data is simply an additional indicator. Mr. Conroy concluded based on the RF propagation studies and drive tests of actual coverage that T-Mobile is effectively lacking signal to provide in-building service in the area. JA544-57. There is no evidence supporting the District Court's evaluation of the dropped call and access failure data.

### 5.    In RF Network Design, If There Is Inadequate Signal Strength To Provide "Reliable" Service, Then There Is No Provision Of Service

The District Court's statements also indicate confusion regarding the use of the term "reliable service" by Mr. Conroy and also confusion regarding the idea that if T-Mobile has any level of RF signal at all, then it is able to provide service. The District Court's views are inconsistent with the clear expert testimony and FCC usage.

In his Reply Report, Mr. Conroy directly addressed this point, explaining that

> ***The mere existence of some level of intermittent and possibly measurable [RF] signal from T-Mobile at certain times does not mean that T-Mobile is effectively able to provide service to customers in an area***. Thus, carriers, such as T-Mobile, must design and deploy wireless networks based on measurable, scientifically valid and statistically justified standards of what will provide reliable service to consumers.

JA467 (emphasis added). He explained further that

from an engineering perspective, carriers, such as T-Mobile, must design and deploy wireless networks based on measurable, scientifically valid standards of what will provide reliable service to consumers. It would be contrary to industry practice and established engineering practice to construct wireless networks that fail to provide reliable service to consumers within their homes and other buildings. ***The fact that by the nature of [RF] signals there may be some chance that some individual may be able to connect a call on the network once, at a given moment, does not mean that there is reliable service coverage in that area***. Thus, to the extent that Ms. Malone opines that "there is no absence of wireless service in the area around the Bell Tower Site," her opinion is not based on any scientifically valid or measurable standard.

JA468 (emphasis added).

Likewise, in support of his opinions, Mr. Conroy presented a document entitled "The Technical And Scientific Basis For T-Mobile's 2G Design Standard" ("Design Standard Document"). JA484-97. The Design Standard Document explains that "[i]t is important to understand that the levels of coverage do not represent an objective to achieve a higher level of call quality ***but to maintain a minimum signal strength*** and hence reliability of service at the mobile handset as the environment changes." JA485 (emphasis added).

The FCC's regulations also recognize the concept that for there to be cognizable service, it must be "reliable" service with signal levels above the necessary level. One example is in the FCC's 1993 PCS Order, as discussed above. *See, e.g., PCS Order*, 8 F.C.C.R. at 7754 n.106, 7774 n.130 (addressing minimum signal levels for "reliable service"). Likewise, the FCC has not defined

53

when there is or is not service, but the FCC defines a "dead spot" as "[s]mall areas within a service area where the field strength is lower than ***the minimum level for reliable service***.  Service within dead spots is presumed."  47 C.F.R. §22.99 (emphasis added).  The FCC's definition recognizes that to constitute an area where service is offered, there must be RF strength sufficient to provide "reliable service."  Accordingly, if T-Mobile lacks *reliable* in-vehicle and/or in-building service, it has an absence of service.

In *Fairfax County*, Judge Davis correctly observed that, "[w]hile the Telecommunications Act does not guarantee '100% coverage,'" even "the majority recognizes that at some point a wireless provider's inability to provide reliable service in a particular area becomes so significant that it amounts to an 'effective absence of coverage.'"  672 F.3d at 279 (Davis J., dissenting).  Judge Davis noted that, "[b]ecause a wireless device requires not just *some* signal to provide reliable service but rather a *sufficiently strong signal*, the question whether a gap in service is significant is one of degree, and necessarily depends on a variety of factors, such as those enumerated by the First Circuit in *Cranston*."  *Id.*; *see also Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 49, 51 (1st Cir. 2009) (recognizing "[a]s cell phone use increases, carriers need to build more facilities, especially in populated areas, to continue providing reliable coverage" and rejecting bright line rule for defining sufficient signal strength); *Second Generation Props. L.P. v.*

54

*Town of Pelham*, 313 F.3d 620, 632 n.13 (1st Cir. 2002) (interpreting stress on "adequate" coverage in *Willoth* to reject an "any coverage equals no gap" rule); *Ramapo*, 701 F.Supp.2d at 457(same).

Thus, the use of the term reliable does not, as the District Court suggests, mean that T-Mobile has service but seeks to provide higher quality service. Rather, the nature of RF propagation is such that even at very low signal levels, there is a hypothetical possibility that a customer inside their home could momentarily obtain sufficient signal to initiate a call, but it would not last and the call would be dropped. That situation is not "service" that any consumer would accept as a viable service for which they would pay a monthly fee. As an engineer, Mr. Conroy cannot deny the hypothetical possibility of that momentary, chance connection, but it is not "reliable" enough for him to deem it an area with service when he, as an RF engineering expert, is evaluating an area. This same concept is reflected in the FCC's definitions and usages.

### 6. The District Court Erroneously Concluded That T-Mobile Sought A "100% Reliability Standard"

Ultimately, the District Court concludes "The Court cannot read the 100% reliability standard offered by T-Mobile and its experts into subparagraph B(i)(II)." JA134.

First, T-Mobile never offered a "100% reliability standard." It is unclear from where the District Court derived this assertion. It appears that the court may

55

have been referring to a response by Mr. Entner to a question in deposition. He was asked about his use of the term "reliable service," and his response was that he meant "that when a person would like to make or receive a call that they have the ability to do that to the full length of the duration." JA422. Counsel for the Board then asked whether he meant that "a hundred percent of the time," and Mr. Entner explained that was "in [consumers'] expectation" but that not all people had that expectation. JA423. However, Mr. Entner never purported to articulate T-Mobile's technical "standard of reliability" nor was his response to counsel's questions an unequivocal advocacy for T-Mobile to provide 100% in-building coverage.

Rather, Mr. Conroy is the technical expert regarding relevant and appropriate network design standards, and Mr. Conroy provided a detailed, scientific explanation of T-Mobile's network design criteria and standards. The Design Standard Document explains that "[t]o successfully provide reliable In-Building Residential coverage, a T-Mobile customer should be able to place or receive a call on the ground floor of a building that is three stories or less in height successfully across 95% of the site's coverage area." JA486. The Document clarifies that "it is critical to understand that this standard is NOT a 95% call success rate." JA488. Accordingly, it is inaccurate to assert that T-Mobile demands 100% reliability.

Second, the District Court's discussion also appears to stem from the Fourth Circuit's statement, in dicta, in *360° Communications Co. v. Board of Supervisors of Albemarle County*, 211 F.3d 79 (4th Cir. 2000), that "[t]he Act obviously cannot require that wireless services provide 100% coverage." *Id*. at 87; *see also* JA131 (quoting *Albemarle*). The basis for the Court's assertion in *Albemarle* was that "federal regulations contemplate the existence of dead spots, defined as 'small areas within a service area where the field strength is lower than the minimum level for reliable service.' 47 C.F.R. §22.99." *Id.* As discussed above, the FCC's definition of a dead spot recognizes that if the signal strength in an area is lower than the minimum level for reliable service, then there is no service – unless the area is so small that it constitutes a "dead spot," in which case, service is nonetheless deemed to exist. Thus, if there is less than the minimum signal level necessary for reliable service, the court must evaluate whether the area is so small as to be a "dead spot."

Courts have described what constitutes a "dead spot" as a factual and contextual issue. For example, in *Willoth,* the Second Circuit explained that a dead spot is limited in size and may include the interiors of buildings "in a sparsely populated area" but not the interiors of buildings "as the area covered by buildings increases." 176 F.3d at 643-44; *see also Cellular Tel. Co. v. Zoning Board of Adjustment of Borough of Ho-Ho-Kus*, 197 F.3d 64, 70 n.2 (3d Cir. 1999);

*Omnipoint Commc'ns MB Operations, LLC v. Town of Lincoln*, 107 F.Supp.2d 108, 119 (D. Mass. 2000)(same).  In *Huntington Beach*, the court held that "where coverage holes are large or frequent in number and size, *or extend to the interior of buildings in urban areas or to a significant number of residences in well-populated areas*, such coverage holds *are* actionable under the [Act]."  2012 WL 4867775, at *17 (first emphasis added)(internal quote omitted).

In this case, Mr. Conroy testified that 10,536 people live in the area where T-Mobile lacks in-building coverage.  JA550.  Clearly, an area with the population larger than many small towns is not a mere "dead spot."

Accordingly, T-Mobile has established that it has a legally cognizable lack of signal in an area that is greater than a mere dead spot.  The District Court's conclusion to the contrary was erroneous.

### C.   There Are No Reasonable Alternatives Available to Remedy T-Mobile's Coverage Deficiency

In *Fairfax County*, the court rejected any specific formal test for demonstrating a lack of reasonable alternative sites, instead commenting that proving a lack of reasonable alternatives is a fact-based inquiry depending on the specifics of a particular case.  672 F.3d at 266-67.  The facts demonstrate that T-Mobile has no reasonable, feasible alternatives.

### 1.   T-Mobile Undertook A Diligent And Complete Search, Ruling Out All Reasonable Potential Alternatives

T-Mobile chose the Bell Tower Site after considering other potential alternatives and thoroughly searching for collocation opportunities.

T-Mobile began with a search for existing structures on which it could attach its antennas and cure its coverage deficiency. JA166-67, 992-93, 1168-76. This search revealed an existing 142 foot Ham radio tower, but the County informed T-Mobile that the Ham radio tower was not legally permitted by the County, and, therefore, T-Mobile would not be allowed to attach its antennas to it. JA167, 1173-76. T-Mobile also considered the possibility of installing its facilities on the roof of the Potomac Gardens Apartments, located across Potomac View Road, east of the Church property. JA167, 992-93. However, the Potomac Gardens Apartments are neither tall enough to meet T-Mobile's RF needs, nor structurally sufficient to support installation of T-Mobile's facilities. *Id*. There are no other existing structures of sufficient height in the vicinity of the Bell Tower Site to cure T-Mobile's coverage deficiency. JA657 (Staff Report stating that "there are no tall structures in the vicinity that would allow for collocation.").

Another limiting factor to finding a suitable location was the County zoning. The Church property is zoned CR-1, which permits the construction of new free-standing facilities. JA168, 301-02 [§5-618(B)(2)(a)], 686, 1179. However, the other locations within T-Mobile's search area are zoned either Residential (R-1 or

59

R-4) or Planned Development – Housing (PDH). *Id*. Free-standing wireless

telecommunications facilities are not permitted in R or PDH zones. JA301-07 [§5-

618(B)(2)(c), (B)(3)(l), (C)(3)(l)]. Thus, T-Mobile's search for a leasable and

construct-able location was limited to the CR-1 zone. JA168, 1179. Other than the

Ham radio tower, which was already rejected by the County, the only suitable and

available property that T-Mobile found in the CR-1 zone was the Church property,

and the Board has not suggested or identified any alternatives within the CR-1

zone.

After identifying the Church property in the CR-1 zone, T-Mobile worked

with the Staff to choose a design and location on the property that best conformed

with the County's Comprehensive Plan and zoning requirements. *See* JA979-84,

1002-16. T-Mobile originally considered constructing a stealth flag-pole structure

on the Church property. JA168. After consultation with the Church, the flag-pole

design was replaced with a stealth light-pole design that would be located in the

southwest corner of the Church parking lot. *Id*. After Staff and members of the

community expressed their dissatisfaction with the proposed light-pole design and

location, T-Mobile investigated various alternative designs, seeking Staff input to

select the best design for the site. JA979-84, 1002-16, 1059-61, 1070-76. After

several options were considered and discussed with both the Church and Staff,

including a tree-pole and steeple installation, the design and location of the

proposed Bell Tower Site was selected as the best feasible alternative.  JA168, 979-84, 1044-55.

County Planning Staff requested that T-Mobile consider existing telecommunications facilities at the Old Dominion University Building at Mirror Ridge and the Sterling Park Safety Center, but T-Mobile already has facilities at those two locations, and new facilities would not remedy the deficiency in coverage.  JA168, 555-56, 585-87.

> ### 2. The Theoretical Designs Proposed By The Board's Witness Are Not Available Or Will Not Remedy The Effective Absence Of Service

In her report, Ms. Malone proposed several hypothetical locations to place facilities instead of the Bell Tower.  In his reply report, Mr. Conroy fully responded to Ms. Malone's suggestions, explaining that they are not feasible. JA478-82.  At a minimum, other than moving the Bell Tower around the Church property, each of Ms. Malone's suggestions are located in PDH zones, where, as noted above, free standing monopoles are not permitted.  JA301-07, 516. Nonetheless, Ms. Malone suggests that T-Mobile could rebuild a traffic signal or rebuild an existing flagpole at the Sugarland Run Community Center as a "stealth" flagpole.[5]  JA516.  Yet, either of these options would require installing new

---

[5] For example, the existing Sugarland Run Home Owners Association flag pole identified by Ms. Malone is only approximately 34 feet tall, and sits directly in

freestanding wireless communications structures in a PDH zone, which would be "monopoles," which are prohibited. JA349. Likewise, none of the other buildings she hypothetically identifies are of sufficient height to provide for viable collocation options to meet T-Mobile's coverage needs, and using multiple sites will not provide the coverage Ms. Malone asserts. JA364-67, 480.

Ms. Malone also suggests that T-Mobile could attach to wooden utility poles along Potomac View Road. T-Mobile did consider the existing utility distribution poles that line the west side of Potomac View Road. JA169, 585-87. Those poles are approximately 40 feet tall, so they would need to be replaced with much taller poles in order to meet T-Mobile's needs. *Id*. However, the owner of those poles, Dominion Virginia Power, has specific policies and limitations regarding attaching antennas to its poles. JA169. For example, Dominion does not install distribution poles taller than 65 feet. *Id*. Thus, even if T-Mobile could install on one of the utility poles, it could not achieve the height required to remedy the deficiency in coverage. Critically, Dominion does not allow antennas to be placed on poles with three phase transformer backs, step-down transformers, protective equipment such as switches and reclosers, terminal poles, poles with multiple existing risers and poles with existing communication boxes or meters. *Id*. Yet, each of the poles on Potomac View Road (on and adjacent to the Church property and running north

front of the entrance to the HOA community center/pool. JA366. It would have to be entirely replaced and would become a monopole. JA349, 366, 369-71.

and south on Potomac View Road) has one of the features that under Dominion's attachment rules prohibit T-Mobile from attaching its antennas even if it could achieve satisfactory height. *Id*.

Ms. Malone and the Board insist that T-Mobile could hypothetically install a tower at some other location on the Church property, and therefore there are "alternatives." JA514-16, 523. First, the Church has testified that it will not allow T-Mobile to rebuild the church's steeple to install a facility there, as suggested by Ms. Malone. JA324-25, 515. Second, the position that moving the tower a few feet on the Church property constitutes an "alternative" is untenable, as the District Court correctly recognized. The community opposition to the Bell Tower focused on preventing ***any*** wireless facility on the Church property, at all. *See* JA609-11, 615, 875-933. It is not credible to contend that another redesign on the same property or any proposal on any property in the R-1, R-4, or PDH zones would meet a different fate. Indeed, the District Court agreed, stating at oral argument, when counsel for the Board insisted that he did not know how the community would react to an application to install a tower elsewhere on the Church Property: "I can tell you. 'Not in my neighborhood.'" JA112.

### 3. The District Court's Analysis Depended On The Erroneous Premise That A Lack Of In-Building Service Is Not A Cognizable Deficit

The District Court erroneously concluded that T-Mobile failed to demonstrate that Ms. Malone's suggested "two-site" proposal was not a feasible alternative. The sole basis for the District Court's conclusion was the court's erroneous belief that T-Mobile does not need to have sufficient RF signal strength to provide in-building service. Specifically, the court stated that "T-Mobile argues that the alternative sites are not 'of sufficient height to provide for viable collocation options to meet T-Mobile's coverage needs, and using multiple sites will not provide the coverage Ms. Malone asserts.'" JA135. The District Court then stated that "the Court infers that, by 'coverage needs,' T-Mobile refers to its own standard for in-building reliability. T-Mobile disputes whether the alternative sites would allow it to attain its preferred level of reliability of service in the area." *Id*. Thus, the District Court rejected Mr. Conroy's testimony that Ms. Malone's two-site alternative would not remedy the effective absence of coverage based on the court's mistaken conclusion that T-Mobile does not need to have in-building service.

As demonstrated above, this is not an issue of T-Mobile's "preferred level of reliability." Rather, federal regulations call for T-Mobile to establish its technical standards for service, and the undisputed evidence is that T-Mobile's signal level

standards are scientifically valid and consistent with standard industry practice. (*supra* Sec. V.B.4.). Thus, the District Court's rejection of evidence that Ms. Malone's two-site proposal would not remedy T-Mobile's deficit in service was based on the erroneous premise that in-building service is not necessary.

### 4. The District Court Erroneously Ignored Mr. Conroy's Testimony That Ms. Malone's Coverage Predictions Were Inaccurate And Unreliable

The District Court also erroneously rejected – without basis – Mr. Conroy's testimony that Ms. Malone's RF propagation studies were inaccurate and were over-predicting the coverage from the two-site proposal. Mr. Conroy testified that Ms. Malone's RF propagation estimates, particularly the estimate of the coverage that would be achieved by the two-site proposal, were clearly over-predicting coverage and were inaccurate. JA475-77, 480. Mr. Conroy explained that the propagation model used by Ms. Malone requires "tuning" to perform accurately, but that Ms. Malone did not perform that tuning. JA475-77. Mr. Conroy explained that the drive test data revealed the actual coverage and in particular the signal losses due to the tall trees throughout the area. *Id.* Mr. Conroy further testified that comparing the drive test data to Ms. Malone's propagation estimates, it appeared that Ms. Malone did not incorporate drive test data into her model, and therefore, Mr. Conroy determined that Ms. Malone's RF predictions were inaccurate and unreliable. *Id.*

65

The District Court erroneously failed to consider Mr. Conroy's testimony regarding the inaccuracy and unreliability of Ms. Malone's predictions. At a minimum, and in the alternative, the dispute in testimony between Mr. Conroy and Ms. Malone prevented the court from granting summary judgment to either party. *See Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Decision Insights, Inc. v. Sentia Group, Inc.*, 416 Fed.Appx. 324, 329-30 (4th Cir. 2011); *In re French*, 499 F.3d 345, 353-54 (4th Cir. 2007).

## VI. THE DISTRICT COURT ERRED IN HOLDING THAT THE BOARD'S DENIALS WERE SUPPORTED BY SUBSTANTIAL EVIDENCE AND DID NOT VIOLATE 47 U.S.C. § 332(c)(7)(B)(iii)

### A. Substantial Evidence Standard

Section 332(c)(7)(B)(iii) of the Act provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence in a written record." 47 U.S.C. §332(c)(7)(B)(iii). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Virginia Beach*, 155 F.3d at 430 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).[6]

---

[6] Although Virginia applies a "reasonable legislator" standard to these types of Board decisions, under no circumstance can state law allow a local decision making body to deny a wireless permit application based on evidence that is not

Concerns that are "objectively unreasonable, such as concerns based upon conjecture or speculation," will not amount to substantial evidence. *Petersburg Cellular P'ship v. Board of Supervisors of Nottoway County*, 205 F.3d 688, 695 (4th Cir. 2000). "There must be evidence. And not just any evidence – evidence that is *substantial*. And substantial evidence must be substantiated by something." *West Bloomfield*, 691 F.3d at 801. Further, the Court must view the record in its entirety, including evidence opposed to the Board's decision. *See American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981); *Oyster Bay*, 166 F.3d at 494; *Pine Grove Twp.*, 181 F.3d at 408.

The Act requires this Court to determine whether substantial evidence supports the Board's decision "to *deny* a request." *T-Mobile Northeast LLC v. City Council of Newport News*, 674 F.3d 380, 387 (4th Cir. 2012), *cert. denied*, 2012 U.S. LEXIS 6854 (Oct. 1, 2012). The Court must look to the requirements of the County's own Zoning Ordinance to determine whether the reasons for the Board's decision are contemplated therein. *Id. See also T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County*, 546 F.3d 1299, 1307 (10th Cir. 2008). A denial is not based on substantial evidence if it is based on evidence or issues that T-Mobile was

---

"substantial evidence" as defined by the federal Act. *West Bloomfield*, 691 F.3d at 799 ("The 'substantial evidence' standard constructs a floor below which the justification for denying a permit cannot fall.").

not required to submit under the Zoning Ordinance. *See, e.g., Wyandotte County*, 546 F.3d at 1307-08.

In this case, the Board's denials were not supported by substantial evidence, and the District Court erred in concluding that they were.

### B.     Stephens Silo Site

Under the Zoning Ordinance, a silo is a permitted use in an AR-1 zone, subject only to an administrative permit confirming that the silo meets applicable setback requirements. JA174-79. Silos are exempt from any height limitations. JA174-79, 1583-84. All antennas in the proposed Stephens Silo Site are hidden within the silo. JA1251, 1258, 1273, 1351-52. Thus, the visual impact of the proposed Stephens Silo Site is the same as a silo that could be constructed by right without even the opportunity for public comment or complaint. The Board's conclusion that the proposed silo will "not blend with the natural and built environment of the surrounding area," therefore, cannot be supported by substantial evidence because the County has already determined that a silo – of any height – is an appropriate fit in the AR-1 zone. Accordingly, the District Court's finding that the height and visual impact of the Stephens Silo Site "remained a legitimate concern for residents of the area, and it was appropriate for the Board to consider this issue in deciding how to handle the Stephens Silo application" is clear error. JA140.

Moreover, the District Court's finding that "T-Mobile failed to pursue preferred locations for its facility," is mistaken.  JA141.  First, whether and when the Simpson Farm silos were in foreclosure or available to lease is irrelevant to whether T-Mobile failed to "pursue preferred locations."  Under the County's scheme, an applicant must first search for existing towers and other tall structures on which it could co-locate.  JA304-05, 316-17, 1350-51.  The undisputed evidence demonstrates that the existing Simpson silos were not tall enough for T-Mobile to co-locate on them.  JA166-67, 1480, 1510-11, 1516-18.  The District Court's assertion that "T-Mobile fails to explain why extending the tallest of the existing silos was a feasible option for meeting its coverage objectives in 2009 but is no longer an option," (JA142), misses the point.  The County scheme prefers co-locating on existing structures, however, extending the height of an existing structure to accommodate a new facility is considered a new structure under the County's scheme and therefore no more preferred than the proposed Stephens Silo Site.  JA298-323, 344-46, 349-50, 1350-51, 1384.  Thus, whether the Simpson Farm silos could be extended to meet T-Mobile's needs is irrelevant to the question of whether T-Mobile pursued preferred (i.e. existing) alternatives.  Indeed, as the County Staff recognized, "[t]here are currently no viable existing towers, buildings, or other tall structures within a two (2) mile radius on which to co-locate the proposed telecommunications antennas."  JA1345.

The evidence and findings of the Staff and Planning Commission contradict the Board's denial.  Importantly, while the Board provides no analysis for the conclusions in its denial, both the July Staff Report and the September Staff Memo provide ample support and analysis for its finding that the proposed facility is consistent with all County requirements. JA1251-1275, 1338-61.  The Staff and Planning Commission reports are evidence that the Board cannot simply ignore. *See, e.g., West Bloomfield*, 691 F.3d at 799; *Telespectrum, Inc. v. Public Serv. Comm'n of Ky.*, 227 F.3d 414, 423-24 (6th Cir. 2000).  The District Court erred in finding that there was substantial evidence to support a denial of the Stephens Silo Site.

### C.    Bell Tower Site

The Board allegedly denied the Bell Tower Site because it is in a suburban residential area, and the comments of the Board make clear that the fundamental objection was to any wireless facility in a residential area.  JA604.  The District Court erred in finding that *initial* concerns voiced by the Staff and Planning Commission, and then residents about the visual impact and residential compatibility of the proposed facility amounted to substantial evidence to support the denial.[7]  JA138-40.

---

[7] Contrary to the District Court's statement, T-Mobile addressed Staff's concerns about the "height and proximity to residences."  The location of the final design is farther from residences, JA1039, 1126, and while the height is the same as the

Under Zoning Ordinance Section 6-1316, the Church could construct a bell tower in conformance with the Church's special exception subject only to Zoning Administrator approval. As a result, when the Planning Commission recommended approval of the Bell Tower Site, it told the Board that the Church could construct a bell tower of the identical design a mere six feet shorter than T-Mobile's proposal **by right** with a simple administrative process. JA731. Indeed, the Church could build an even taller bell tower by right by slightly moving its location. *Id.* The Planning Commission noted that "[a] church and its accompanying bell tower in a residential neighborhood, by its nature, may rightly be out of scale with its neighbors, without being a detriment to the neighborhood." JA731. Thus, at the time it denied the Bell Tower Site, the Board understood that the visual impact of the proposed facility was nearly identical to the visual impact of a structure that could not be denied based on visual impact.[8]

---

flagpole design, the impact of that height is mitigated because the bell tower matches the Church and is a structure naturally associated with a church. JA662-63. The Bell Tower design was the result of an extensive process with the Planning Commission and Staff as well as the public. Ultimately, Staff's and the Planning Commission's initial concerns were addressed and they both recommended approval. JA651-69.

[8] The District Court's argument that T-Mobile's involvement creates a commercial motivation that somehow changes the analysis is meritless. JA147. The issue is not the Church's motivation. The point is that the Board has already determined that a bell tower at a church *is* visually compatible with surrounding neighborhoods. T-Mobile's involvement does not change that, and therefore, there can be no "substantial" evidence that the Bell Tower is not visually compatible merely because of T-Mobile's involvement.

71

This demonstrates that the Board's decision was not genuinely based on the visual impact or compatibility of the proposed facility. Citizen opposition to the Bell Tower Site was focused on perceived effects of RF emissions, resorting even to emotional pleas involving children. JA744-55, 828-30, 840-72. JA633-34, 712, 714-718; SA2-11.[9]

The Board responded to the citizens' health concerns. Supervisor Miller recognized the community's "renewed concerns about health considerations." JA704. Supervisor McGimsey, who sponsored the motion to deny, understood that RF emissions were "the number one concern for the community," (JA730), thanked the residents who came out in opposition, and declared "we're protecting your neighborhood." JA615. The natural inference is what Supervisor Miller acknowledged at the July 19, 2011 Board meeting and elaborated on at the October 17, 2011 Board meeting: the Board denied the Bell Tower Site based on residents' concerns regarding the health effects of the RF emissions, while concealing that reason behind the veil of "visual impact." JA704, 1187-89. Thus, it is clear that the Board's denial was actually based on RF emissions in violation of Section 332(c)(7)(B)(iv), and not supported by substantial evidence.

Finally, the Board cannot deny the application based on general arguments that wireless facilities are incompatible with a residential area when in fact the

---

[9]  Concurrently with this Brief, T-Mobile has filed its Motion for Leave to File Supplemental Appendix, with SA pages 1-12 attached thereto.

72

Zoning Ordinance permits wireless towers in the Church's zone subject to a special exception. The Board's "consensus that areas zoned for residential development may not be suitable locations for telecommunications facilities," (JA589) cannot change the fact that the proposed facility is allowed in this "residential" zone. It is well established that the Board cannot deny based on grounds that are inconsistent with its own code. *See, e.g., Wyandotte County*, 546 F.3d at 1307; *MetroPCS, Inc. v. City & County of San Francisco,* 400 F.3d 715, 723-24 (9th Cir. 2005); *T-Mobile Northeast, LLC v. Frederick County Bd. of Appeals*, 761 F.Supp.2d 282, 286 (D. Md. 2010).

## VII.  CONCLUSION

For the foregoing reasons, the District Court was correct to grant T-Mobile summary judgment on Count V, and it erred in denying summary judgment to T-Mobile on all other counts. The District Court's order on Count V should be affirmed and the remainder of its order reversed, with instructions to enter judgment for T-Mobile on all counts and order the approval of both sites.

T-Mobile respectfully requests oral argument.

Respectfully Submitted,


　/s/　　　　　　　　　　　
T. Scott Thompson
Daniel P. Reing
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006
(202) 973-4200

April 26, 2013

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

No. 12-2396-L          **Caption:** T-Mobile Northeast LLC v. Loudoun County Board of Su

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used only with monospaced type]*

☑    this brief contains _____16,482_____ [*state the number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains _____ [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

☑    this brief has been prepared in a proportionally spaced typeface using
MS Word 2010 [*state name and version of word processing program*] in
Times New Roman, 14 point [*state font size and name of the type style*]; *or*

☐    this brief has been prepared in a monospaced typeface using
_____ [*state name and version of word processing program*]
with _____ [*state number of characters per inch and name of type style*].

(s) T. Scott Thompson _____

Attorney for Appellee/Cross-Appellant _____

Dated: 04/26/2013 _____

Rev. 03/03/11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

J. Patrick Taves, VSB #18610
T. David Stoner, VSB #24366
Michael W.S. Lockaby, VSB #74136
*Attorneys for The Loudoun County Board of Supervisors*
GREEHAN, TAVES, PANDAK & STONER, PLLC
14520 Avion Parkway, Suite 210
Chantilly, Virginia   20151
703-378-5770
ptaves@gtpslaw.com
dstoner@gtpslaw.com
mlockaby@gtpslaw.com

John R. Roberts, County Attorney
Ronald J. Brown, Deputy County Attorney
*Attorneys for The Loudoun County Board of Supervisors*
LOUDOUN COUNTY ATTORNEY'S OFFICE
One Harrison St., S.E., Fifth Floor
Leesburg, Virginia 20175
703-777-0307
jack.roberts@loudoun.gov
ron.brown@loudoun.gov

_____/s/_____

T. Scott Thompson
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave. NW, Suite 800
Washington D.C. 20006
202-973-4200
202-973-4499
scottthompson@dwt.com

*Counsel for T-Mobile Northeast LLC,
Plaintiff-Appellee*